| | |
|---|---|
| ALABAMA DISABILITIES ADVOCACY PROGRAM, PLAINTIFF, | |
| vs. | |
| SAFETYNET YOUTHCARE, INC., DEFENDANT. | CIVIL ACTION NO. 13-0519-CG-B |
| SAFETYNET YOUTHCARE, INC., THIRD PARTY PLAINTIFF, | |
| vs. | |
| ALABAMA DEPARTMENT OF HUMAN RESOURCES, THIRD PARTY DEFENDANT. | |

## PLAINTIFF ADAP'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff Alabama Disabilities Advocacy Program ("ADAP") submits this memorandum in support of its motion for summary judgment against Defendant SafetyNet Youth Care, Inc. ("SafetyNet") for violating ADAP's federal right to access a SafetyNet facility, thereby preventing ADAP from conducting statutorily-authorized monitoring activities designed to protect the civil rights and safety of

individuals with disabilities.

ADAP is Alabama's federally-mandated Protection and Advocacy ("P&A") agency for persons with disabilities. The nationwide P&A system was created by Congress forty years ago in response to the gross abuse and neglect of institutionalized individuals with disabilities. Recognizing that state systems for monitoring compliance with respect to the rights of individuals with disabilities vary widely and are frequently inadequate, 42 U.S.C. § 10801(a)(4), Congress created and authorized the P&A system, with agencies in every state and territory, to protect individuals with disabilities in three primary ways: 1) monitor conditions in all settings where individuals with disabilities receive care and treatment; 2) investigate allegations of abuse and neglect against individuals with disabilities in all settings where they receive care and treatment; and 3) pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with disabilities.[1] Writing in concurrence in *Indiana Protection & Advocacy Services. v. Indiana Family & Social Services Administration*, 603 F.3d 365 (7th Cir. 2010), Judge Posner explains that P&A agencies, such as ADAP, have a special role in preventing abuse and neglect of individuals with disabilities, by acting in a

---

[1] *See* Protection and Advocacy for Individuals with Developmental Disabilities Act ("PADD Act") and its implementing regulations at 42 U.S.C. §§ 15041 et seq., 45 C.F.R. § 1386 et seq.; Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act") and its implementing regulations, 42 U.S.C. § 10801 et seq., 42 C.F.R. § 51 et seq.; and Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. §§ 794e, et seq., 34 C.F.R. § 381.

"whistleblower, ombudsman, watchdog, advocacy and 'private attorney general' role." *Id.* at 383.

Defendant SafetyNet runs two residential programs at its Academy Campus in Minter (AL) that serve youth in Alabama's foster care system – the SafetyNet Moderate Program and the SafetyNet Intensive Program. SafetyNet has denied ADAP access to its Moderate Program, prohibiting ADAP from conducting its federally-authorized monitoring activities there. Plaintiffs will demonstrate the Moderate program serves youths with disabilities, as defined by ADAP's federal enabling statutes. Likewise, Plaintiffs will demonstrate the Moderate Program is a facility that provides care and treatment, as defined by ADAP's federal enabling statutes. As the Moderate Program is a facility providing care and treatment to individuals with disabilities, ADAP has the legal authority to access the facility to conduct monitoring - to be that "watchdog" that Judge Posner declares the P&A system to be.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact with reference to the pleadings or other materials on file. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). After the movant has satisfied this initial burden, the burden of production shifts to the nonmoving party to demonstrate the existence of any genuine issue of fact. *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 841 (11th Cir. 1990). In deciding whether summary judgment is appropriate, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## STANDING

ADAP has a legally protected interest in accessing facilities that provide care and treatment for individuals with disabilities, the violation of which constitutes a direct injury in fact to itself. Three federal statutes authorize and structure the P&A system's work: the PADD, PAIMI and PAIR Acts. The statutes each and together grant ADAP the legal right to access and monitor facilities providing care and treatment to any individual with any disability, 42 U.S.C. § 15043(a)(2)(H), 42 U.S.C. § 10805(a)(3), to respond to allegations of abuse and neglect, and to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with disabilities who are receiving the care or treatment in the State." 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. §

10805(a)(1)(B); 29 U.S.C. § 794e(f)(2) (adopting by reference the same authorities as are set forth in the PADD act, 42 U.S.C. § 15041 et seq.).[2]

Article III of the Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." *Art. III, § 2*. The United States Supreme Court has established three elements that a plaintiff must meet to show a justiciable case or controversy within the meaning of Article III. The first is an "'injury in fact' -- the invasion of a legally-protected interest" which is (a) concrete and particularized and (b) actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, there must be a causal relationship between the injury and the conduct complained of. *Id.* Finally, "it must be 'likely,' as opposed to 'speculative' that the injury will be redressed by a favorable decision." *Id.* at 561.

Actual or threatened injury may exist by virtue of a statute creating legal rights and the invasion of that right. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). While the Supreme Court has also recognized additional prudential limitations for standing, when Congress intends a statute to grant standing to the full limits of

---

[2] This incorporation into the PAIR Act of provisions of the PADD Act is one indication that Congress intended the access provisions of the PAIMI, PADD, and PAIR statutes to be interrelated and applied consistent with each other. In addition, the legislative histories of both the PAIMI and PADD Acts suggest that the access authority under each is meant to be consistent with the other. *See* S. Rep. No. 99-109, at 2-3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362-63; S. Rep. No. 100-113, at 24 (1987), *reprinted in* 1987 U.S.C.C.A.N. 781, 803-04. Further, the preamble to the implementing regulations for the PAIMI Act states that it is the goal of the U.S. Department of Health and Human Services "to ensure that all facets of the P&A system administered by the Department" i.e., the PAIMI and PADD Acts "are subject to the same requirements." 62 Fed. Reg. 53549 (Oct. 15, 1997) (codified at 42 C.F.R. pt. 51).

Article III, courts "lack authority to create prudential barriers to standing in suits brought under that [statute]." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).

Since the source of the complained of injury lies in the invasion of a legal right created by federal statute, and because the injury in this case is to ADAP, it is not necessary that ADAP overcome any prudential limits such as by showing associational standing. This case is unlike other cases involving P&A agencies in which the agency is seeking to enforce patients' statutory rights. See *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999). In cases where the P&A agency brings a suit on behalf of its members, alleging injury to individuals with mental illness, developmental disability or other disability, the agency must satisfy the requirements of associational standing. The Eleventh Circuit has explicitly acknowledged that this theory of standing is distinct from a P&A agency's standing to sue to enforce its own legal rights. *Id.* at 883.

In *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 427 (M.D. Ala. 1995), *aff'd* 97 F.3d 492 (11th Cir. 1996) the Eleventh Circuit implicitly recognized ADAP's standing to redress injuries to itself. The district court for the Middle District of Alabama, in a decision affirmed by the Eleventh Circuit, held that ADAP had standing to sue defendant for refusing to release records to ADAP under the PADD Act in the course of it conducting an

investigation. First, the court held the denial of access to records constituted a direct injury to ADAP's concrete, legally-protected interest in investigating abuse, to the extent that such investigations entail examining records, and to ADAP's statutory interest in the records themselves. Second, the court noted a direct relationship between defendant's denial of access to records and ADAP's inability to investigate and access the records. Third, the court found that requiring the defendants to turn over the requested records would redress the injury to ADAP's interests. Therefore, the court concluded, ADAP met the standing requirements. *Tarwater*, 894 F. Supp. 424, 427 (M.D. Ala. 1995), *aff'd* 97 F.3d 492 (11th Cir. 1996).

ADAP has a legal right under the PADD, PAIMI, and PAIR statutes to access and monitor the SafetyNet Moderate Program. SafetyNet's refusal to grant ADAP access to conduct its federally-authorized monitoring activities is the cause of an actual and concrete injury to ADAP. A decision in ADAP's favor granting the relief sought will redress this injury because ADAP will be permitted to access the facility. For these reasons, ADAP satisfies the constitutional requirements for standing.

## STATEMENT OF UNDISPUTED FACTS

1. SafetyNet Academy is a child care institution[3] licensed by the Alabama Department of Human Resources ("DHR") pursuant to Ala. Code 38-7-1, et seq. (1975). (Ex. A, SafetyNet Response to ADAP's Request for Admissions, ¶21); (Doc. #7, SafetyNet Answer to Complaint, ¶2.)

2. Defendant SafetyNet has a contract with DHR to provide services through its Moderate Program to youth with "moderate and/or serious emotional and/or behavioral management problems." (Ex. B, DHR #000183, Contract between DHR and SafetyNet for the Moderate Program)

3. SafetyNet's Moderate Program is a residential setting providing overnight accommodations and services for males 13-18 years old. (Doc. #7, ¶19); (*See generally* Ex. B)

4. Among the services offered by the Moderate Program are: coordination and provision of individual counseling, psychiatric services, psychiatric assessments, family counseling, psychological testing, group counseling, medication supervision, constant adult supervision, and special education. (Ex. A, ¶13, ¶14, ¶17, ¶19); (Ex. B, DHR #000184, #000193, #000194) (Ex. D,

---

[3] A child-care institution or institution for child-care is a "child-care facility where more than 10 children are received and maintained for the purpose of providing them with care or training or both, or transitional living program services. ALA. CODE § 38-7-38 (1975)

SafetyNet's Supplemental Response to ADAP's First Request for Production ¶9)

5. "[O]nly youth who have a Diagnostic & Statistical Manual; Fifth Edition (DSM-V) diagnosed mental illness from a psychological evaluation conducted within the past 24 months" can be admitted into any Moderate Program. (Ex. C, DHR #000053, DHR's Request for Proposal for Moderate Program)

6. The Moderate Program serves youth with a variety of disabilities including, but not limited to: Attention Deficit Hyperactivity Disorder, Depressive Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, Reactive Attachment Disorder, Oppositional Defiant Disorder, and Conduct Disorder. (Ex. A, ¶10)

7. One-third of Moderate Program youth are eligible to receive special education services under federal and state law. 20 U.S.C. § 1401(3); Ala. Admin. Code § 290-8-9-.03. Special education is defined, in part, as specially designed instruction that meets the unique needs of a child with a disability. Ala. Admin. Code § 290-8-9.00(21). These youth are eligible for special education services because of identified Learning Disabilities, Autism, Intellectual Disability (i.e.

Mental Retardation), Emotional Disability, and/or Other Health Impairments.[4] (Ex. D, ¶9)

8. Approximately 72% of young persons who resided in the Moderate Program from 2012-2014 took medication to treat a psychiatric condition, mental disorder, emotional disorder, or a behavioral disorder. (Ex. E, Email from SafetyNet counsel Stewart McCloud to ADAP providing a supplemental response to ADAP's Request for Production ¶5)

9. Placement in a Moderate Program is "limited to children whose needs cannot be met in their own home, traditional foster home, basic residential care, or children who have reached their treatment goals in a more restrictive setting and are ready to be 'stepped down.'" (Ex. C, DHR #000053)

10. Young persons served in Moderate Programs typically (1) need clinical treatment to be able to function in school, home, or the community because of multiple problems; (2) have not responded successfully to less intensive treatment/and or have been denied admission or discharged from various placements because of emotional and behavioral disruption; and/or (3) have behavior that is not well controlled without constant adult supervision or use of

---

[4]Children eligible for special education services under the category of Other Health Impairment have "limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette Syndrome." Ala. Admin. § Code 290-8-9-.03(9).

psychotropic medication; basic structure and nurturance are not sufficient to meet their needs. (Ex. B, DHR #000184)

11. SafetyNet contracts with a psychiatrist who "covers" the Moderate Program three-four times per month and provides on-call services 24 hours per day. (Ex. B, DHR #000193) The psychiatrist assesses for medication management and diagnostic purposes upon admission and monthly thereafter. (Ex. B, DHR #000193)

12. The Moderate Program conducts diagnostic (i.e. psycho-educational and psychological) testing on Program youth. (Ex. B, DHR #000194)

13. The Moderate Program addresses the following treatment issues among others: poor social boundaries, familial conflict, grief and loss, depression, attachment issues, and physical, sexual, and emotional abuse. (Ex. A, ¶20)

14. SafetyNet therapists conduct mental health consultations regularly, but at a minimum monthly, with the referring DHR Social Workers. When planning for discharge, therapists conduct mental health consultations with, for example, a student's future teachers, mental health therapist, and psychiatrist. (Ex. B, DHR #000191)

15. Moderate Programs must have 24-hour wake staff for proper supervision of youth. (Ex. C, DHR #000053)

16. SafetyNet's Moderate Program provides services to residents which meet the administrative code requirements of the Alabama Medicaid Agency's "Rehabilitative Services" program - a "set of specialized services of a medical or remedial nature delivered by uniquely qualified practitioners designed to treat or rehabilitate persons with mental illness or substance abuse diagnoses." Alabama Admin. Code Rule No. 560-X-47.01 (Ex. B, DHR #000193); (Ex. C, DHR #000057)

17. ADAP sent SafetyNet correspondence on October 2, 2012, January 14, 2013, and April 29, 2013, informing it of ADAP's authority to monitor and advising SafetyNet of ADAP's intent to monitor the Moderate Program. (Ex. A, ¶1, ¶2, ¶4) (Doc. # 7, ¶27)

18. Defendant SafetyNet denied ADAP access to monitor its SafetyNet Academy Moderate Program on January 22, 2013, May 1, 2013, and October 21, 2013. (Ex. A, ¶5, ¶7, ¶9)

## ARGUMENT

**I.    ADAP IS AUTHORIZED UNDER FEDERAL LAW TO ACCESS FACILITIES WHICH PROVIDE CARE AND TREATMENT TO PERSONS WITH DISABILITIES TO MONITOR AND TO INVESTIGATE ALLEGATIONS OF ABUSE AND NEGLECT.**

### A. The P&A as "Watchdog"

Under the PADD, PAIMI and PAIR Acts, ADAP is authorized to:

- monitor facilities to ensure safety and prevent rights violations;
- teach individuals with disabilities about their rights and about P&A services;
- provide information and training, and referral to, programs addressing the needs of individuals with disabilities;
- meet and communicate privately with individuals with disabilities;
- go into facilities to investigate abuse and neglect[5] and interview victims and witnesses; and
- access individual records when certain conditions are met.

42 CFR 51.42; 45 CFR 1386.22.

The PADD Act provides, at 42 U.S.C. §15043(a)(2)(H), that a P&A shall "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual." In turn, the PADD Act regulations at 45 C.F.R. §1386.22(g) clarify that this mandate includes the authority to conduct monitoring activities. The regulation states that "the system and all of its authorized agents shall have unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours," for purposes of providing information, training and referrals; and "monitoring compliance with respect to the rights and safety of service recipients." The legislative history of the

---

[5]Abuse and neglect involves any knowing, reckless, or intentional act or failure to act by an employee of a facility, which caused or may have caused injury or death, including rape or sexual assault, striking, the use of excessive force in restraints, the use of bodily or chemical restraints not in compliance with federal and state law, mental or emotional harassment, and "any other practice which is likely to cause immediate physical or psychological harm or result in long-term harm if such practices continue." 45 C.F.R. § 1386.19; 42 C.F.R. §51.2  Neglect involves negligent acts or omissions such as failure to establish or carry out an appropriate individual program or treatment plan, provide adequate nutrition, clothing, health care, or a safe environment, which also includes failure to maintain adequate numbers of appropriately trained staff. 45 C.F.R. §1386.19; 42 C.F.R. § 51.42.

analogous provision contained in the 1994 version of the PADD Act states that this requirement is intended to "assure that the most vulnerable individuals [facility residents] who may not be able to contact the P&A system will have access to protection and advocacy services." S. Rep. 120, 103rd Cong.1st Sess. 36 (1993).

The PAIMI Act, at 42 U.S.C. 10805(a)(3), gives P&As "access to facilities in the State providing care or treatment." The Act's legislative history states Congress' expectation:

> that facilities will provide the [PAIMI] system with reasonable access to all inpatients and residents in [facilities that provide care and treatment] to enable the systems to inform all such individuals of their rights under Federal and State law and the U.S. Constitution and to explain the nature and scope of the system's authority under the Act. Informing a mentally ill individual of his or her rights is a critical function of a protection and advocacy system.
>
> S. Rep. 454, 100th Cong., 2d Sess. 11 (1988).

Putting these provisions into action, when ADAP monitors a facility, we engage with residents regarding, for example, the services they are being provided, their treatment by and experiences with staff and fellow residents. We inform them about ADAP's services and how we can protect and promote their safety, well-being, and civil rights. We provide information about services and supports from other public and/or private agencies that might benefit them (e.g. job development, education, or accessible housing services). We observe for unsafe conditions in a facility (e.g. dangerous items which could be obtained by a facility

resident to self-harm), inappropriate practices (e.g. impermissible use of seclusion or restraint), or conditions which might prevent equal access to programming by individuals with disabilities. We visit (and are able to photograph) all areas of a facility to which a resident has access and conduct our monitoring unaccompanied by facility staff. We talk privately with facility residents to ensure they can freely discuss their concerns without fear of harassment or retribution by facility staff. We coordinate our visit with facility administration in order to avoid disrupting current programming where possible.

Over 40 years, ADAP has monitored a variety of settings including jails, detention centers, group homes, nursing homes, hospitals, prisons, sheltered workshops, state-run institutions, and residential treatment facilities. These facilities have been licensed or certified by the Alabama Department of Mental Health, Department of Youth Services, Alabama Department of Education, Alabama Department of Public Health, various county agencies, and DHR - including visits to Tri-Will and Boyd School – identified as Moderate Programs by DHR. (Ex. F, ADAP's Response to Item #3 of Defendant DHR's Request for Production of Documents)

Distinct from, but related to, its authority to monitor, ADAP is empowered by the PADD, PAIMI and PAIR Acts to investigate allegations of abuse and neglect. Summarizing the P&A investigation authority briefly: upon obtaining

information that leads ADAP to suspect abuse or neglect is occurring in a program providing care and treatment to a person with disabilities, the three statutes empower ADAP to request records of the alleged victim and to interview any facility service recipient, employee, or other persons, including the alleged victim as part of an investigation. 45 C.F.R. § 1386.22(f); 42 C.F.R. § 51.42. ADAP's authority to investigate abuse and neglect in SafetyNet's Moderate Program is not at issue in this litigation. However, ADAP's ability to identify potential abuse and neglect through its own observations of facility conditions and engagement with SafetyNet residents – which would then warrant ADAP carrying out an investigation at the facility – is implicated and threatened. ADAP's ability to "detect and deter"[6] abuse and neglect through monitoring visits is vital when considering the population served in facilities providing care and treatment. Often individuals living in a facility are isolated from family, friends, and even court-appointed advocates making it difficult for them to report allegations of abuse and neglect. Many facility residents, due to limitations associated with their disability, are unable to identify when abuse or neglect has occurred or lack knowledge of their right to treatment. *Id.* at 4. SafetyNet residents, like those in other Moderate Programs, are especially vulnerable because of their youth and immaturity; even more than an adult, they are unlikely to know that a resource like ADAP is

---

[6] Ex. G, Statement of Interest of the United States, at 4-5 *Disability Rights Miss. v. Miss. Children's Home Services*, 3:13-CV-547-HTW-LRA filed on 02/05/14.

available to help them. The court in *Robbins v. Budke*, 739 F. Supp. 1439 (D.N.M. 1990) noted the special needs for outreach and coordinated advocacy services for facility residents. The court found that persons with mental illness are vulnerable to abuse and neglect because many have difficulty "recognizing the concept that they have rights and will not necessarily identify even the most egregious abuse as a violation of their rights." Even if cognizant of their rights, many of these individuals would have "difficulty assessing whether their rights have been violated and may have difficulty identifying P&A as a resource to remedy rights violations." *Id.* at 1486. The same concerns are equally applicable with respect to persons with developmental and other disabilities who may have similar special needs, vulnerabilities and limitations as persons with mental illness.

### B. SafetyNet's Moderate Program serves children with disabilities.

Any individual having a disability as defined by the PADD and/or PAIMI or PAIR statutes is eligible to receive ADAP's protection and advocacy services, including its monitoring services. The PADD Act created and empowered the P&A system to advocate on behalf of persons with developmental disabilities, defined, in part, as persons who have a severe, chronic disability [which] is attributable to a mental or physical impairment or combination of mental and physical impairments. 42 U.S.C. § 15043(a)(2)(D); The PAIMI act defines an individual with mental illness as a person who has a significant mental illness or emotional impairment as

determined by a mental health professional qualified under the laws and regulations of the State and is an inpatient or resident in a facility rendering care or treatment. 42 U.S.C. § 10802(4).[7] The PAIR Program expanded the role of the P&A system again, authorizing it to advocate on behalf of persons with disabilities ineligible for services under either the PADD or PAIMI Acts. Rehabilitation Act, 29 U.S.C. § 794e.1. The PAIR program essentially closed any gaps in the scope of the P&A system, allowing P&A agencies to serve persons with any type of disability.[8]

SafetyNet's Moderate Program serves children with disabilities. Only youth who have a DSM-V diagnosed mental illness can be admitted into the Moderate Program. (Ex. C, DHR #000053) The disabilities presented by SafetyNet residents can include, but are not limited to: Attention Deficit Hyperactivity Disorder, Autism, Depressive Disorder, Learning Disabilities, Intellectual Disabilities, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, Reactive

---

[7] The PAIMI Act was amended in 2000 to include individuals living in community settings, including their own homes. 42 U.S.C. §10804(4). The PAIMI regulations have not been updated to reflect these changes. As a result, the regulations still refer to "residents" and "facilities" even though the coverage of the PAIMI Act now covers both residential and non-residential settings. See, *State of Connecticut Office of Protection and Advocacy v. Hartford Bd. of Education,* 464 F.3d 229(2nd Cir. 2006) and amicus brief filed by the U.S. Departments of Education and Health and Human Services; *Wisconsin Disability Rights v. Wisconsin Dept. of Public Instruction,* 463 F.3d 719 (7th Cir. 2006).

[8] The term "individuals with disabilities" in the PAIR Program refers to the definition of "individual with disabilities" in the Rehabilitation Act of 1973, 29 USC § 705(20)(B), which in turn incorporates the definition of "disability" in the 2008 Amendments to the Americans with Disabilities Act at 42 USC § 12102: The term "disability" means, with respect to an individual--(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3)).

Attachment Disorder, Oppositional Defiant Disorder, and Conduct Disorder and other health impairments. (Ex. A, ¶10); (Ex. D, ¶9)

By SafetyNet's own calculations, approximately 72% of all youth residing in the Moderate Program from 2012-2014 took medication to treat a psychiatric condition, mental disorder, emotional disorder, or a behavioral disorder. (Ex. E, ¶5)

One-third of SafetyNet's Moderate Program youth are eligible to receive special education services (one of the enumerated "care and treatment" services under the PAIMI regulations, 42 C.F.R. § 51.2) under federal and state special education law. 20 U.S.C.S. §1401(3); Ala. Admin. Code § 290-8-9-.03. That is, they are identified as children with disabilities who, by reason of those disabilities, need special education and related services. SafetyNet youth are eligible for special education services because of identified Learning Disabilities, Autism, Intellectual Disability (Mental Retardation), Emotional Disability, and/or Other Health Impairments. (Ex. D, ¶9)

Young persons in the Moderate Program have such significant needs that their behavior is not well controlled without constant adult supervision and/or the use of psychotropic medication – factors which contributed to their placement at the Program in the first place. (Ex. B, DHR #000184)

A P&A need not demonstrate that <u>every</u> individual residing in a program providing care and treatment actually has a disability before it is allowed to conduct monitoring activities. Previous courts have held that a P&A need only show substantial, not conclusive evidence that there are individuals with disabilities being served at a program in order to justify the P&A's exercise of its monitoring authority. For example, in *Michigan Protection and Advocacy Service, Inc. v. Miller,* 849 F. Supp. 1202 (W.D. Mich. 1994), Michigan's Department of Social Services ("DSS") denied the Michigan P&A ("MPAS") access to monitor a juvenile facility. The Court granted summary judgment to MPAS holding that the P&A "has offered substantial evidence indicating that many DSS facilities have in the past housed minors who suffered mental illness, as determined by mental health professionals." The Court went further to state that evidence offered by the P&A "also suggests that some current DSS residents may be mentally ill" which was sufficient under the PAIMI Act to warrant P&A access. *Id.* at 1207. *See also Kentucky Protection and Advocacy Division v. Hall*, 2001 U.S. Dist. LEXIS 26316 at 6, (W.D. Ky. Sept. 24, 2001), ("Demanding a conclusive, individualized showing of developmental disability or mental illness before permitting entry would reserve to Defendant a gatekeeping function contrary to the specific terms and general purposes of the Acts." Slip op. at 4; *J.H. ex rel. Gray v. Hinds County*, Miss, 2011 WL 3047667, at 3-5 (S.D. Miss., July 25, 2011).

Defendants have suggested that while an Axis I diagnoses is required for admission to the Moderate Program, an Axis I diagnosis alone is not sufficient to meet the PAIMI definition of "significant mental illness and emotional impairment." Congruent with the holding in *Miller* that a P&A need only show that some residents of a facility may have mental illness for a P&A to have access, the Court in *Disability Rights Washington v. Penrith Farms,* 2009 WL 777737 at 3 (E.D. Wash., 2009), held that an Axis I diagnoses "is sufficient evidence that some residents may be mentally ill" and "that it is plausible that by inviting those [with Axis I diagnoses] to live at Penrith Farms some residents might be sufficiently afflicted by these various disorders to rise to the level of significant mental illness." Even assuming that not all youth with Axis I diagnoses in the Moderate Program reach the level of impairment contemplated by the PAIMI Act (which the defendants' admissions and proffered documents demonstrate otherwise), ADAP can still monitor in the program because 1) there is sufficient evidence that <u>some</u> of the residents would reach that level of impairment and 2) there is sufficient evidence that there are <u>some</u> residents who are eligible (some potentially dually eligible) for services under either the PADD and PAIR Acts. This would include those youth with, for example, developmental or other disabilities like Autism, Intellectual Disabilities, and learning disabilities. (Ex. D, ¶ 9)

### C. SafetyNet's Moderate Program is a facility providing care and treatment.

The scope of ADAP's access to facilities is broad and includes a wide variety of levels and types of care from hospitals to board and care homes. Under PAIMI, the term "facilities" *"may include, but need not be limited to"* hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons. 42 U.S.C. § 10802(3) (emphasis added).[9] The PAIMI regulations define a facility's "Care or Treatment" as services "provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluation, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation, even if only 'as needed' or under a contractual agreement." 42 C.F.R. §51.2. Under the PADD Act, a facility is defined as "any setting that provides care, treatment, services and habilitation, even if only 'as needed' or under a contractual arrangement. Facilities include, but are not limited to the following: Community living arrangements (e.g., group homes, board and care homes, individual residences and apartments), day programs, juvenile detention centers, hospitals, nursing homes, homeless shelters, jails and prisons." 45 C.F.R. §1386.19.

---

[9] As noted previously, amendments to the PAIMI Act expanded coverage of a P&A's access to individuals with mental illness "living in community settings, even their own home." 42 U.S.C. §10804(4).

The plain language contained in the PADD and PAIMI statutes, i.e., "included but not limited to," communicates Congress' intent that ADAP's authority to access programs providing care and treatment for individuals with disabilities should not be circumscribed by a narrow statutory construction.[10] Numerous courts have affirmed a P&A's authority to monitor conditions at a broad variety of facilities providing care and treatment to individuals with disabilities. *See, e.g. Office of Prot. & Advocacy for Persons with Disabilities v. Armstrong,* 266 F. Supp. 2d 303 (Conn. 2003) (state prison); *J.H. v. Hinds County,* 2011 U.S. Dist. LEXIS 81659 (juvenile justice center); *Conn. Office of Prot. and Advocacy for Persons with Disabilities v. Hartford Board of Education,* 464 F.3d 229, 240 (2d Cir.2006) (non-residential public school for children with severe emotional disturbance); *Michigan Protection and Advocacy Service v. Miller,* 849 F.Supp. 1202 (W.D. Mich. 1994) (youth mental health facility); *Kentucky Protection and Advocacy Division v. Hall,* 2001 U.S. Dist. LEXIS 26316 at 6, (W.D. Ky. Sept. 24, 2001) (child care facility for adolescent boys).

SafetyNet's Moderate Program – licensed by DHR as a child-care facility – provides extensive care and treatment to its residents. Among the services offered by the Moderate Program are: coordination and provision of individual

---

[10] The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. *United States v. Goldenberg,* 168 U.S. 95, 102-103(1989); If a court finds the words of a statute are unambiguous, then "judicial inquiry is complete 'except in rare and exceptional circumstances.'" *Rubin v. United States,* 449 U.S. 424, 430, (1981) (quoting *TVA v. Hill,* 437 U.S. 153, 187, n. 33 (1978)).

counseling, psychiatric services, psychiatric assessments, family counseling, psychological testing, group counseling, medication supervision, constant adult supervision, and special education. (Ex. A, ¶13, ¶14, ¶17, ¶19); (Ex. B, DHR #000184, DHR #000193, DHR #000194) (Exhibit D, ¶9). Indeed, it is the need for such care and treatment that can lead to a youth's placement in the Moderate Program in the first place.

## CONCLUSION

Defendants cannot have it both ways. They cannot require that a child have a DSM-V diagnosis, determine that he meets the criteria for entry into SafetyNet's Moderate Program because of his significant needs[11] so he can receive an extensive array of rehabilitative and support services which, by contract, the Program must be able to provide (and for which it receives Medicaid and federal special education dollars) and then turn around and suggest that the child does not have a disability and that SafetyNet Moderate's Program is not a facility which offers care and treatment.

---

[11] i.e., the child (1) needs clinical treatment to be able to function in school, home, or the community because of multiple problems; or (2) has not responded successfully to less intensive treatment/and or has been denied admission or discharged from various placements because of emotional and behavioral disruption; and/or (3) has behavior that is not well controlled without constant adult supervision or use of psychotropic medication. (Ex. B; DHR #000184).

SafetyNet's Moderate Program serves youth with disabilities and provides them care and treatment. As such, ADAP is requesting full and complete access to monitor the Moderate Program as it is authorized to do under federal law.

**WHEREFORE,** premises, considered, ADAP respectfully requests that this Court ORDER Injunctive Relief on its behalf by requiring immediate access to the SafetyNet Academy Moderate Program.

## ORAL HEARING IS REQUESTED

September 19, 2014

Respectfully Submitted,

Signature: */s/Andrea J. Mixson*

Andrea J. Mixson, ASB-2155R79M
David J. Slawkowski, ASB-0810D57S
Attorneys for Plaintiff,
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, AL 35487
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
Email: amixson@adap.ua.edu

COUNSEL FOR THE PLAINTIFF