# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | |
|---|---|
| Disability Rights Mississippi,<br>Plaintiff,<br><br>v.<br><br>Mississippi Children's Home Services,<br>Defendant. | )<br>)<br>)<br>)<br>)  CAUSE NO. 3:13-CV-547-HTW-LRA<br>)<br>)<br>)<br>) |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517,[1] because this litigation involves the proper interpretation and application of federal law. As the United States has made clear in litigation across the country, it has a strong interest in the interpretation of the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801–10851. *See, e.g.*, Statement of Interest of the United States, Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin., No. 1:06-cv-1816 (S.D. Ind. June 16, 2008); Brief for Intervenor United States of America, Iowa Prot. & Advocacy Servs., Inc. v.

---

[1] Section 517 provides that the "Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517. A submission by the United States pursuant to this provision does not constitute intervention under Rule 24 of the Federal Rules of Civil Procedure.

Tanager Place, No. 04-4074 (8th Cir. May 11, 2005). Therefore, the United States offers the Court its understanding of the statute and regulations at issue in this case.[2]

## ARGUMENT

Plaintiffs, representatives of the local protection and advocacy organization, have brought this case seeking access to a psychiatric residential treatment center serving children in Mississippi. Defendants argue that the access Plaintiffs seek is not guaranteed by law. The United States Statement of Interest will establish that the PAIMI Act was intended to protect vulnerable people with disabilities by affording broad access rights to protection and advocacy organizations. A central function of these organizations is to conduct monitoring, even in the absence of abuse and neglect complaints from residents. Monitoring activities include facility visits and also unaccompanied opportunities to speak with residents of the facilities. The PAIMI Act is undermined if protection and advocacy organizations are denied these rights, or required to litigate each time they seek access to a facility and its residents.

### A. The PAIMI Act was Passed to Protect a Vulnerable Population

Congress enacted this law because it found that "individuals with mental illness are vulnerable to abuse and serious injury," and that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801. The law grew out of a congressional staff investigation that uncovered fear and intimidation at psychiatric facilities. *Care of Institutionalized Mentally Disabled Persons: Joint Hearings Before the Senate Subcomms. on the Handicapped and on Labor, Health and Human Services, Education, and Related Agencies,* 99th Cong. (1985). Staff visiting psychiatric facilities across the nation found evidence of physical abuse, sexual abuse, verbal

---

[2] The United States recognizes that the Parties' briefing on this issue has concluded and would not object if the Court wishes to offer the Parties an opportunity to respond to the United States.

threats, regular harassment, reliance on seclusion and mechanical restraints, inadequate treatment, and indecent living conditions. *Id.* at 3. In one graphic example of the abuse and neglect, investigators found a patient died while tied to a bed in full restraints and was discovered soaked in her own urine. *Id.* at 24. Investigators reviewed existing monitoring mechanisms and determined that monitoring conducted by the states and other accreditation bodies was not sufficient to prevent and remedy the violations of law. *Id.* at 5, 76-114. After conducting a thorough analysis, congressional staff determined that protection and advocacy services were desperately needed. *Id.* at 81.

In response, Congress passed the PAIMI Act and explained that the statute's purpose is "to ensure that the rights of individuals with mental illness are protected and to assist States to establish and operate a protection and advocacy system that will (1) protect and advocate for the rights of those individuals; and (2) investigate incidents of abuse and neglect." H.R. Rep. 102-319, November 15, 1991. To achieve this goal, the law provides funding and authority for a system of protection and advocacy organizations across the country.[3]

Since PAIMI was enacted nearly 30 years ago, protection and advocacy organizations have used their authority to address widespread abuse, neglect, and exploitation in psychiatric institutions around the country. A recent report on PAIMI enforcement identified the significant impact that protection and advocacy organizations have when they are able to monitor and investigate facilities on behalf of vulnerable people whose every action is controlled by their service providers. *See* Substance Abuse and Mental Health Services Administration, HHS Pub. No. PEP12-EVALPAIMI, *Evaluation of the Protection and Advocacy for Individuals With Mental Illness*

---

[3] Congress enacted parallel legislation to protect the rights of people with developmental disabilities, 42 U.S.C. § 15041, and people with disabilities other than mental illness and developmental disabilities. 29 U.S.C. § 794e(a)(1).

*(PAIMI) Program, Phase III. Final Report.* (2011). For example, the report describes how one protection and advocacy organization helped a family find a safe environment for their child after he was placed at a residential treatment facility where staff members were abusing children. *See id.* at 13. In another case, a man with kidney cancer who was institutionalized at a psychiatric hospital did not receive needed medical care until the protection and advocacy organization advocated on his behalf. *Id.* In yet another instance, a protection and advocacy organization litigated on behalf of a class of individuals with mental illness who were inappropriately discharged from a psychiatric hospital to nursing facilities where they received no mental health treatment and were subject to strict limits on their activities and movement. *Id.* All of these cases, and many thousands of others, demonstrate the importance of the protection and advocacy system established by the PAIMI Act.

While the Department of Justice plays a role in the enforcement of the constitution and federal law in institutional settings, *see, e.g.*, 42 U. S.C. § 1997 et seq., the protection and advocacy system is a critical partner in that work. It is not possible for the Department of Justice to investigate all allegations of abuse and neglect and to monitor all facilities across the country. For these reasons, it is imperative that the protection and advocacy organizations are able to monitor facilities and investigate claims of abuse and neglect.

**B. Monitoring is a Critical Part of Protection and Advocacy Organizations' Mandates**

When establishing the protection and advocacy system, Congress wisely recognized that protection and advocacy organizations must be empowered to regularly monitor facilities providing treatment to people with disabilities. Regular monitoring enables advocates to detect and deter abuse and neglect in facilities that might not otherwise come to the attention of the advocates. People living in psychiatric residential treatment facilities are particularly vulnerable

to abuse because they are struggling with significant medical needs, are often isolated from their families and communities, and their ability to reach out to outside advocates is restricted. In addition, they are often unfamiliar with their rights or with the advocates available to help them. In order to successfully prevent and remedy violations of rights, the PAIMI Act provides that protection and advocacy organizations shall, "have access to facilities in the State providing care or treatment." 42 U.S.C. § 10805. This provision stands in addition to, and independent of, the statute's provision for conducting investigations of abuse allegations, indicating that the two afford distinct authorities.

1. *PAIMI Regulations Affirm Protection and Advocacy Organization Monitoring Access Rights*

The regulations promulgated by the Department of Health and Human Services ("HHS") under the PAIMI Act carry out Congress's design and make very clear that protection and advocacy organizations need not be conducting an investigation of a specific allegation in order to access a covered facility.[4] Because these regulations by the agency entrusted to administer the PAIMI program elucidate and give force to the statute, they are afforded great deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

---

[4] Access to covered facilities was not intended to be limited to a specific group of facilities, but rather to any facilities in which people with disabilities reside and receive treatment. The Conference Committee Report on the original legislation explained that, "It is the intent of the conferees that this legislation focus on abuse and neglect of mentally ill individuals and not on the particular residential facility in which they reside. Accordingly, residential facilities could include, **but need not be limited to,** hospitals, nursing homes, community facilities for mentally ill individuals, and board and care homes." H.R. Conf. Re. 99-576, May 5, 1986 (emphasis added).

5

The regulations provide that for purposes of education, training, monitoring, and inspection,

> a P&A system shall have reasonable unaccompanied access to facilities ... and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. Residents include adults or minors who have legal guardians or conservators. P&A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview. 42 C.F.R. § 51.42(c).

The regulations define unaccompanied access as "the opportunity to meet and communicate privately with individuals regularly, both formally and informally, by telephone, mail and in person." 42 C.F.R. § 51.42(d). The plain language of the regulation reaffirms that a protection and advocacy organization must be afforded reasonable unaccompanied access to facilities and residents for the purpose of monitoring and education even where there is no allegation of abuse or neglect. The text also explicitly empowers protection and advocacy organizations to meet with minors as well as with adults. Thus it is clear that Congress anticipated that protection and advocacy organizations would need to visit facilities and speak with their residents regularly, regardless of age. Such access enables these organizations to fulfill their missions of educating individuals about their rights and offering residents an opportunity to raise questions or concerns about their care with an independent advocate.

*2. Federal Precedent Affirms Protection and Advocacy Monitoring Access Rights*

So unambiguous are the regulations that there has been little recent litigation on the simple question of access to facilities for monitoring and education. In the few decisions that touch on protection and advocacy organizations' authority to conduct monitoring, including unaccompanied access to residents, courts have recognized that the statute unmistakably contemplates monitoring access. *See, e.g., Protection & Advocacy System, Inc. v. Freudenthal*, 412 F.Supp.2d 1211, 1213 (D. Wyo. 2006) ("These acts and their implementing regulations

authorize P & A to investigate allegations of abuse and neglect; to monitor; to provide training on rights and make referrals and to pursue legal, administrative and other remedies. They also authorize P & A to obtain access to records under specific circumstances."); *Equip for Equality, Inc. v. Ingalls Memorial Hosp.*, 292 F.Supp.2d 1086, 1095-98, 1100 (N.D. Ill. 2003) ("A P & A system must be given the leeway to discover problems or potential problems at a facility"); *Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs*, L.L.C., 152 F.Supp.2d 1150. 1169-70 (N.D. Iowa 2001) (considering access to a psychiatric facility for youth and noting that protection and advocacy organization representatives are empowered to conduct unaccompanied interviews for monitoring purposes). Courts have explained that curtailing protection and advocacy organizations' access would thwart the goals laid out by Congress in PAIMI. *See Equip for Equality*, 292 F.Supp.2d at 1099 ("requiring tours of a facility to be announced and accompanied would seriously hinder a P & A system's ability to monitor the facility for compliance with the rights and safety of the patients and would thwart the purpose of the federal and state acts."); *Robbins v. Budke*, 739 F.Supp. 1479, 1487 (D.N.M. 1990) (finding hospital's policies limiting protection and advocacy organization access to patients with mental illness thwarted PAIMI's purpose). Protection and advocacy organizations are unquestionably authorized to conduct regular unaccompanied monitoring tours of covered facilities in addition to any investigations they conduct.

### C. Reasonable Unaccompanied Access Includes Regular Opportunities to Speak with Residents

The law contemplates that advocates will have regular, even "frequent," unaccompanied opportunities to speak with residents. *See* 42 C.F.R. § 51.42(c); *Mississippi Protection and Advocacy System, Inc. v. Cotton*, 1989 WL 224953 *9 (S.D. Miss. Aug. 7, 1989) ("Only by frequent personal contact with residents, out of the presence of Boswell staff, can MP & A

effectively carry out its mission of pursuing remedies to protect the rights of Boswell residents and of providing the necessary information to them.").[5] Recognizing that people with disabilities may be distrustful of advocates they rarely see, courts have encouraged regular visits with protection and advocacy organization representatives. *See Robbins*, 739 F.Supp. at 1486. Defendants argue that the protection and advocacy organization suffers no harm when entirely precluded from conducting complete monitoring visits because it made two, unrelated visits previously. *See* Def.'s Resp. at 9, 18-19, Dkt. No. 20. There is no numerical limit, in statute, regulations, or precedent, on how often a protection and advocacy organization may visit a covered facility. The visits, themselves, must simply be reasonable.

In contravention of the law, facilities sometimes attempt to place significant limits on the frequency and ease with which protection and advocacy representatives can speak with residents. Of course, the regulations provide that advocates should minimize disruption of facility programs, but that obligation does not negate their right to regular, voluntary, unaccompanied interviews of residents. *See* 42 C.F.R. § 51.42(c). While courts have recognized the need to weigh a facility's practical concerns, including concerns about impact on treatment, they have determined that such concerns do not preclude the protection and advocacy organizations' access rights. *See, e.g., Equip for Equality*, 292 F.Supp.2d at 1100 (requiring unaccompanied access to residents with 24-hours notice); *Pennsylvania Protection & Advocacy, Inc. v. Royer–Greaves School for the Blind*, No. 98–3995, 1999 WL 179797, at *11–12 (E.D.Pa. Mar. 24, 1999) (same).[6] The statute and its implementing regulations provide for unaccompanied access to

---

[5] This case was filed under PAIMI's companion legislation protecting the rights of people with developmental disabilities.

[6] This case was filed under PAIMI's companion legislation protecting the rights of people with developmental disabilities.

residents, *specifically including children*; facilities cannot defeat this access by making unsupported allegations that access will be disruptive or harmful. *See* 42 C.F.R. § 51.42(c) ("Residents include adults or minors"); *Robbins*, 739 F.Supp. at 1488 ("Defendants claim that patient care and a therapeutic environment will be totally disrupted if P & A's presence at LVMC is not controlled to the extent that it is at present. I am not persuaded that this is true."); *Michigan Protection & Advocacy Service, Inc. v. Miller*, 849 F.Supp. 1202, 1208 (W.D. Mich. 1994) ("defendant has failed to indicate how the access MPAS seeks would 'substantially interfere' with DSS programs"). Concerns about access, even well-intentioned, do not overcome the judgment Congress made when authorizing protection and advocacy organizations to conduct unaccompanied interviews.

While some courts have limited *unannounced, unlimited, 24-hour access* to residents of a facility, the limits imposed have been minimal. For example, a few courts have required protection and advocacy organizations seeking to meet with or interview residents to provide 24-hours notice of their visit. *See Equip for Equality*, 292 F.Supp.2d at 1100-02; *Pennsylvania Protection & Advocacy, Inc.* 1999 WL 179797, at *11–12. Ideally, a protection and advocacy organization will be able to work collaboratively with the facility it plans to monitor to establish a protocol that minimizes disruption to the facility program, without overly restricting the organization's work. Where the parties are unable to resolve the contours of an agreed on monitoring protocol, courts have found that authorizing protection and advocacy organizations broad access rights is appropriate. *See id.*

### D. Requiring Protection and Advocacy Organizations to Seek Court Orders Each Time They Wish to Gain Access to Facilities Would Significantly Impair Their Work

Requiring protection and advocacy organizations to go to court every time they seek access afforded by the statute would frustrate the goals of PAIMI and unnecessarily burden the

9

courts. *See Advocacy Center v. Stalder*, 128 F.Supp.2d 358, 364 (M.D. La.1999) ("it cannot be disputed that the delay in getting a court order frustrates the goal of the PAMII Act."); *Oklahoma Disability Law Center, Inc. v. Dillon Family and Youth Services, Inc.*, 879 F.Supp. 1110, 1112 (N.D. Okl. 1995) ("The timely access guaranteed by the Act should not be stripped of all meaning by requiring advocacy hearings to survive an application for a court order."). The PAIMI Act does not require protection and advocacy organizations to go to court each time they wish to conduct statutorily mandated activities. As a recent evaluation of the PAIMI Act found, "[w]hen forced to litigate access issues, significant portions of [a protection and advocacy organization's] limited resources are consumed – resources that would better be used moving the nation's mental health system forward." Substance Abuse and Mental Health Services Administration, HHS Pub. No. PEP12-EVALPAIMI, *Evaluation of the Protection and Advocacy for Individuals With Mental Illness (PAIMI) Program, Phase III. Final Report.* 87 (2011). Facilities should not be permitted to circumvent Congress's legislation by requiring a court order before permitting meaningful access as required by law.

## CONCLUSION

The PAIMI Act is a critical component in the system of legal protections for people with disabilities and its words must be given full force and effect. Congress unambiguously afforded protection and advocacy organizations the authority to access facilities serving people with disabilities and to the individuals themselves. While facilities may be well-intentioned in seeking to limit access to the physical space or individuals in their care, the law requires them to permit reasonable access, including unaccompanied conversations with residents.

Respectfully submitted,

GREGORY K. DAVIS  
United States Attorney

JOCELYN SAMUELS  
Acting Assistant Attorney General

EVE L. HILL  
Deputy Assistant Attorney General

_/s/ Mitzi Paige_  
MITZI D. PAIGE  
Assistant United States Attorney  
MS Bar No. 6014  
United States Attorney's Office  
Southern District of Mississippi  
501 E. Court Street, Ste. 4.430  
Jackson, MS 39201  
Telephone: (601) 973-2840  
Facsimile: (601) 965-4409  
mitzi.paige@usdoj.gov

_/s/ Deena Fox_  
JONATHAN M. SMITH, Section Chief  
JUDITH C. PRESTON, Deputy Chief  
DEENA S. FOX, Trial Attorney  
New York Bar Registration No. 4709655  
U.S. Department of Justice  
950 Pennsylvania Avenue, NW – PHB  
Washington, DC 20530  
Telephone: 202-305-1361  
deena.fox@usdoj.gov

Of Counsel:

_/s/ William B. Schultz_  
WILLIAM B. SCHULTZ  
General Counsel  
DC Bar No. 218990  
Department of Health & Human Services, Office of the General Counsel  
200 Independence Avenue, SW, Room 713F,  
Washington, DC 20201  
Telephone: 202-690-7741  
Facsimile: 202-690-7998

Dated: February 5, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2014 I electronically filed the United States' Statement of Interest with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

*/s/ Deena Fox*

DEENA S. FOX, Trial Attorney
    New York Bar Registration No. 4709655
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW – PHB
Washington, DC  20530
Telephone: 202-305-1361
deena.fox@usdoj.gov