# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA DISABILITIES ADVOCACY PROGRAM,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Civil Action No. 13-0519-CG-B** |
| **SAFETYNET YOUTHCARE, INC.,** | ) ) ) | |
| **Defendant/Third-Party Plaintiff,** | ) ) ) | |
| **vs.** | ) ) | |
| **ALABAMA DEPARTMENT OF HUMAN RESOURCES,** | ) ) ) | |
| **Third-Party Defendant.** | ) ) | |

## ORDER

This matter is before the Court on 1) the motion for summary judgment (Doc.63)  filed by Plaintiff Alabama Disabilities Advocacy Program ("ADAP") on its claim for declaratory and injunctive relief against Defendant SafetyNet Youthcare, Inc. ("SafetyNet"); 2) the motion for summary judgment (Doc. 62) filed by Defendant/Third-Party Plaintiff SafetyNet on ADAP's claim against it; and 3) the motion for summary judgment (Doc. 64) filed by Third-Party Defendant Alabama Department of Human Resources ("DHR") on SafetyNet's claims against it for indemnity and contribution.

SafetyNet operates a residential facility, licensed by DHR,  which

provides services and treatment for males, from the age 10 years to the age of 18 years, who have certain behavioral and mental health needs.  It provides both a Moderate Residential Service ("moderate program") and  an Intensive Residential Service ("intensive program").  ADAP is Alabama's designated, federally funded program authorized by Congress to protect and advocate for the civil rights of persons with disabilities in Alabama.

The issues involved in the motions require the Court to determine whether ADAP may legally access SafetyNet's moderate program over the objections of DHR.  ADAP, seeking injunctive and declaratory relief, alleges SafetyNet failed or refused to provide ADAP access to monitor all programs at its facility, in violation of the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. §§ 10801 – 10851 (2012); the Protection and Advocacy for Individuals with Developmental Disabilities statutes ("PADD"), 42 U.S.C. §§ 15041 – 15045 (2012); and the Protection and Advocacy of Individual Rights statute ("PAIR"), 29 U.S.C. § 794e (2012). (Doc. 1, pp. 1 – 2, 10). SafetyNet answered ADAP's complaint (Doc. 7) and filed a third-party complaint against DHR (Doc. 8), requesting indemnification and contribution from the state agency. SafetyNet alleges DHR told it not to allow ADAP access to the moderate program. (Doc. 8, p. 3). ADAP, SafetyNet, and DHR subsequently filed motions for summary judgment. (Docs. 62, 63, 64, 70). All three parties responded, opposing each other's motions. (Docs. 71, 72, 73). SafetyNet and DHR then filed their replies. (Docs. 75, 76, 77). The

Department of Justice filed a Statement of Interest supporting ADAP's position. (Doc. 74). After careful consideration, the Court finds that ADAP's motion for summary judgment is due to be granted for the reasons set forth herein, and SafetyNet's motion for summary judgment and request for indemnification and contribution are due to be denied. DHR's motion for summary judgment is also due to be denied.

## I.      FACTS

The dispute began in October 2012, when ADAP sought access to a state-licensed facility, SafetyNet, which provides residential care and treatment to male youths with behavioral health needs. (Doc. 62, Exh. 1, p. 2; Exh. 3, p. 1 – 5; Doc. 63, Exh. 2, p. 8). The parties agree ADAP is allowed access to the intensive program at the facility. (Doc. 65, p. 4). The dispute lies in whether ADAP may access the moderate program.

### A. The Moderate Program

The intensive and moderate programs at the SafetyNet facility provide a residential setting with overnight care for males ages 10- to 18-years-old. (Doc. 62, Exh. 1, p. 1). Residents in the intensive and moderate programs are housed separately at the facility. (Doc. 62, Exh. 1, p. 2). "Intensive residential services are provided in a more restrictive setting," (Doc. 65, p. 12), whereas the moderate program is less restrictive. (Doc. 65, pp. 18 – 19). DHR generally "pursues the least restrictive setting … possible [for the child]."

(Doc. 65, p. 12).

According to the DHR Moderate Residential Services for Children Request for Proposals ("RFP"), the moderate program is specifically intended to provide:

> [R]oom, board and an array of services for a child with moderate and/or serious emotional and/or behavioral management problems that interfere with the child's ability to function in the family, school and/or community setting in other than a residential environment. Moderate placement services are limited to children whose needs cannot be met in their own home, traditional foster home, basic residential care, or children who have reached their treatment goals in a more restrictive setting and are ready to be "stepped down." (Doc. 66, Exh. 15, pp. 17, 36).

Additionally, the moderate program serves only youth with a "Diagnostic & Statistical Manual, Fifth Edition (DSM-V) diagnosed mental illness from a psychological evaluation conducted within the past 24 months." (Doc. 66, Exh. 15, pp. 17, 36).[1] Individuals with a diagnosis of mental retardation are excluded from moderate programs, unless DHR makes an exception. (Doc. 65, p. 27; Doc. 66, Exh. 10, p. 8). Moderate programs also exclude individuals who pose a substantial risk to the safety of others, individuals who need frequent physical management because of aggressive behavior or require intensive behavioral modification strategies, and individuals identified as sex offenders. (Doc. 65, p. 27).

---

[1] The 2009 RFP cited the Fourth Edition (DSM-IV) of the manual. (Doc. 66, Exh. 15, p. 17)

In general, "[m]oderate residential facilities are rehabilitative and group home in focus where individual basic living skills and group and individual counseling are emphasized." (Doc. 65, p. 25). To help care for moderate program residents, SafetyNet provides daily instruction on basic living skills. (Doc. 65, pp. 13, 18). SafetyNet also provides its moderate program residents with individual and group counseling, crisis intervention, psychiatric services, psychological testing, medication monitoring and administering, mental health consultations, constant adult supervision, and special education. (Doc. 63, Exh. 2, p. 8; Doc. 65, pp. 13, 18).

Between January 1, 2012, and August 31, 2014, the moderate program at SafetyNet housed forty-two children with a variety of diagnoses, which included: Bi-Polar Disorder, Major Depressive Disorder, Mood Disorder, Complex Post Traumatic Stress Disorder with mixed Disturbance of Emotions (anxiety) and Conduct, Generalized Anxiety Disorder, Oppositional Defiant Disorder, Persistent Depressive Disorder, Asperger's Disorder, Disruptive Behavior Disorder, Pervasive Developmental Disorder, Disorder of Written Expression, Dysthymic Disorder, Reactive Attachment Disorder, Anxiety Disorder, Intermittent Explosive Disorder, Learning Disorder NOS, Attention Deficit Hyperactivity Disorder (ADHD), Depressive Disorder, Conduct Disorder, Adjustment Disorder with

mixed disturbance of emotion and Conduct. (Doc. 70, pp. 2 – 3; Doc. 70, Exh. 1, pp. 4 – 7). Approximately 72% of the residents took medication to treat a psychiatric condition, mental disorder, emotional disorder, or a behavioral disorder during this period. (Doc. 63, Exh. 2, p. 10). Pursuant to the DSM-V, many of the listed disorders are not "static" but are diagnosed on a continuum from "moderate" to "severe." (Doc. 65, p. 28; Doc. 72, p. 6). Thus depending on the individual needs of residents in the moderate program, it is possible that they can be "stepped up" to an acute setting or "stepped down" to a less restrictive setting following an evaluation. (Doc. 65, pp. 20 – 21).

## B. Refusing ADAP Access to the Moderate Program

From October 2012 to October 2013, ADAP wrote to SafetyNet, requesting, but never gaining, direct physical access to the moderate program. (Doc. 63, Exh. 2, p. 12; Doc. 72, p. 2). ADAP also tried to monitor the moderate program during this period. (Doc. 63, Exh. 2, p. 12). SafetyNet, adhering to "explicit instructions" from DHR, continuously denied ADAP access to the moderate program. (Doc. 8, p. 2; Doc. 62, Exh. 1, pp. 2 – 3).

On October 7, 2013, ADAP sent a demand letter to SafetyNet (Doc. 62, Exh. 5, p. 1), threatening suit if SafetyNet again refused them access. SafetyNet called DHR to "confirm that it was still [DHR's] position that ADAP did not have authority to access residents in the Moderate Program." (Doc. 62, Exh. 1, p. 3). On October 10, 2013, Sharon Ficquette, DHR General

Counsel, responded to ADAP in writing. (Doc. 62, Exh. 6, p. 1). Ficquette's letter said "[DHR] and SafetyNet agree to access by ADAP to SafetyNet's moderate program based upon Eleventh Circuit standard for intensive programs as set out in the case of *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492 (11th Cir. 1996)." (Doc. 62, Exh. 6, p. 1; Doc. 65, p. 5). Based on this case, the letter further stated, "access to the SafetyNet Moderate Program is conditioned upon" "an incident or complaint made to ADAP" about the program; or "probable cause to believe an incident has occurred" at the program. (Doc. 62, Exh. 6, p. 1). DHR also asserted, "Moderate facilities are not Intensive treatment programs and are not considered a part of the Psychiatric Services for Individuals under the Age of 21." (Doc. 62, Exh. 6, pp. 2 – 3; Doc. 65, p. 7). Therefore, DHR did not believe ADAP had the right to access or monitor the moderate program. (Doc. 62, Exh. 6, p. 2).

DHR argues "[t]his case involves a fundamental difference in the concept and purpose of moderate residential services between ADAP and [DHR]. [DHR] maintains that the moderate services program is not accessible to ADAP." (Doc. 65, p. 4). SafetyNet argues it is caught in a Catch-22: it can either comply with ADAP and violate the orders of DHR, its licensing authority, or follow the advice of DHR and violate federal law. (Doc. 62, Exh. 1, p. 7). SafetyNet asserts it "does not, nor has it ever, objected to granting ADAP access to residents in SafetyNet's Moderate Program.

SafetyNet has and continues to comply with the explicit instructions of its licensing agency, [DHR].” (Doc. 62, Exh. 1, p. 5). ADAP states SafetyNet violated its federal right to access the facility, thereby preventing it from “conducting statutorily-authorized monitoring activities designed to protect the civil rights and safety of individuals with disabilities.” (Doc. 63, Exh. 2, p. 1 – 2).

## II.  STANDARD OF REVIEW

The court may grant summary judgment “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” FED. R. CIV. P. 56(a). The substantive law applicable to the case determines what is material. <u>Lofton v. Sec’y of Dep’t of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005). If the nonmoving party fails to make “a sufficient showing on an essential element of her case with respect to which she has the burden of proof,” the moving party is entitled to summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In evaluating the movant’s arguments, the court must view all evidence and resolve all doubts in the light most favorable to the nonmovant. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999). “If reasonable minds might differ on the inferences arising from undisputed facts, then [the court] should deny summary judgment.” <u>Hinesville Bank v. Pony Express Courier Corp.</u>, 868 F.2d 1532, 1535 (11th Cir. 1989). The basic

issue before the court then is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton, 358 F.3d at 809.

## III. THE STATUTES AND REGULATIONS AT ISSUE

PADD, PAMII, and PAIR help protect and advance the interests of those with mental illness or developmental disabilities. Collectively, these laws grant a state's protection and advocacy system ("P&A") the powers to investigate allegations of abuse and neglect, respond to rights violations, and provide general advocacy services on behalf of state residents with disabilities or mental illness.[2] See Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492, 497 (11th Cir. 1996) (discussing "broad remedial framework" of the P&A laws). The statutes grant each P&A certain rights and responsibilities, including the authority to "pursue legal,

---

[2] The statutes authorizing the PAMII P&A systems are currently codified in 42 U.S.C. §§ 10801 – 10851, and the corresponding regulations are found in 42 C.F.R. part 51. The PADD P&A systems are currently codified in 42 U.S.C. §§ 15041 – 15045, and the corresponding regulations are found in 45 C.F.R. parts 1385, 1386, 1387, and 1388. The PAIR P&A systems are currently codified in 29 U.S.C. § 794e, and the corresponding regulations are found in 34 C.F.R. part 381. The United States Code is published every six years, so each citation to the statutes refers to the 2012 version unless otherwise stated. The Code of Federal Regulations is updated annually, so each citation to the regulations refers to the 2014 edition.

administrative, and other appropriate remedies" on behalf of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i); <u>see also</u> § 10805(a)(1)(B) (giving P&A the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State").

To "carry out the purpose" of the laws, the statutes and regulations expressly provide each P&A with access authority to 1) individuals, 2) records, and 3) public and private facilities. 42 U.S.C. §§ 15043(a)(2)(H); 10805(a)(3) (authorizing "access to facilities in the State providing care or treatment"); <u>see also</u> <u>Tarwater Developmental Ctr.</u>, 97 F. 3d at 497 ("It is clear that the Act provides express authority for P&As to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued."). P&A access to individuals is authorized "at reasonable times . . . in a location in which services, supports, and other assistance are provided to such an individual." 42 U.S.C. § 15043(a)(2)(H); <u>see also</u> 42 C.F.R. § 51.42(c) ("a P&A system shall have reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, *and to programs and their residents* at reasonable times, which at a minimum shall include normal working hours and visiting hours") (emphasis added). P&A access to the records of individuals with mental illness or disabilities is also authorized; and, in certain situations, a P&A may access records without consent of either the individual or her legal

guardian. 42 U.S.C. §§ 10805(a)(4); 15043(a)(2)(I). Additionally, P&A access to individuals and records is available at any time for the purposes of conducting a "full investigation of an incident of abuse or neglect." 42 C.F.R. § 51.42(b); 45 C.F.R. § 1386.22(f). Where a P&A is not investigating a specific incident, it is entitled to access facilities "at reasonable times" for the purposes of general advocacy (for example, the distribution of information or routine health and safety monitoring). 42 C.F.R. § 51.42(c); 45 C.F.R. § 1386.22(g); see also 42 C.F.R. § 51.31(c) (a P&A "should establish an ongoing presence in residential mental health care or treatment facilities, and relevant hospital units"). Because the statutes and regulations applicable to this action are numerous, they are discussed in more detail below.

## A. PADD

In 1975, Congress passed the Developmental Disabled Assistance and Bill of Rights Act (the "DD Act"). Pub. L. 94-103, 89 Stat. 486 (1975). The DD Act offered federal funding to assist states in providing services to individuals with developmental disabilities. To receive this funding, states were required to establish a "system to protect and advocate the rights of persons with developmental disabilities." 42 U.S.C. § 6012 (1975); Pub. L. 94-103, 89 Stat. 504. At that time, the DD Act defined developmental disability to include specific conditions (e.g., mental retardation and other conditions closely related to mental retardation, cerebral palsy, epilepsy, autism, and dyslexia), that originated prior to age 18, were expected to continue indefinitely, and

constituted a substantial handicap. 42 U.S.C. § 6001(7) (1975). In 1978, Congress amended the DD Act by raising the age of onset to 22, deleted all references to specific handicapping conditions, and effectively broadened the definition of "developmental disabilities" by basing it on functional limitations. REHABILITATION, COMPREHENSIVE SERVICES, AND DEVELOPMENTAL DISABILITIES AMENDMENTS OF 1978, Pub. L. No. 95–602, Sec. 503, 92 Stat. 2955, 3005. Congress also made clear "the overall purpose" of the DD Act is "to assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential through a system which coordinates, monitors, plans, and evaluates those services and which ensures the protection of legal and human rights of persons with developmental disabilities." Id. at 3004.

In 2000, Congress repealed the 1975 DD Act and replaced it with the Developmental Disabilities Assistance and Bill of Rights Act of 2000. Pub. L. No. 106-402, 114 Stat. 1677 (codified as amended at 42 U.S.C. §§ 15001 – 15115 (2012)). In doing so, Congress specifically included the need for "protection and advocacy systems in each State to protect the legal and human rights of individuals with developmental disabilities" as one of the primary purposes of the law. 42 U.S.C. § 15001(b)(2). The 2000 DD Act redefined "developmental disability" and again framed it in terms of a person's functional limitations, instead of referring to any specific diseases or

causes. 42 U.S.C. § 15002(8);[3] see also Tenn. Protection & Advocacy, Inc. v. Wells, 371 F.3d 342, 347 (6th Cir. 2004) (discussing "how functional limitations, *i.e.*, the result of the condition, govern the determination of whether a person falls under the Act's protection, not medical history, *i.e.*, the cause"). The legislative history of the DD Act shows that Congress has consistently sought to assist all developmentally disabled persons, and has routinely acted to ensure P&As are empowered by law.

---

[3] The statute defines "developmental disability" as follows:

(A) In general

The term "developmental disability" means a severe, chronic disability of an individual that –

  (i)   is attributable to a mental or physical impairment or combination of mental and physical impairments;

  (ii)  is manifested before the individual attains age 22;

  (iii) is likely to continue indefinitely;

  (iv)  results in substantial functional limitations in 3 or more of the following areas of major life activity:

    (I)    Self-care.
    (II)   Receptive and expressive language.
    (III)  Learning.
    (IV)   Mobility.
    (V)    Self-direction.
    (VI)   Capacity for independent living.
    (VII)  Economic self-sufficiency; and

  (v)   reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.

(B) An individual from birth to age 9, inclusive, who has a substantial developmental delay or specific congenital or acquired condition, may be considered to have a developmental disability without meeting 3 or more of the criteria described in clauses (i) through (v) of subparagraph (A) if the individual, without services and supports, has a high probability of meeting those criteria later in life. 42 U.S.C. § 15002(8).

## B. PAMII

In 1986, Congress enacted PAMII. PROTECTION AND ADVOCACY FOR MENTALLY ILL INDIVIDUALS ACT OF 1986; Pub. Law 99–319, 100 Stat 478 (1986). Modeled after the DD Act,[4] Congress crafted PAMII in response to horrific reports of abuse and neglect in state psychiatric hospitals.[5] As a result, the Act is meant to "ensure that the rights of individuals with mental illness are protected." 42 U.S.C. § 10801(b).

Since its inception, Congress has amended PAMII four times. PROTECTION AND ADVOCACY FOR MENTALLY ILL INDIVIDUALS AMENDMENTS ACT OF 1988, Pub. L No. 100-509, 102 Stat. 2543; PROTECTION AND

---

[4] Congress intended that the PAMII Act "would provide for the same kind of assistance for institutionalized mentally ill patients as that which is now available for mentally disabled patients. It would do that by expanding the mandate of state protection and advocacy agencies to include services for the mentally ill." 132 Cong. Rec. H204-03 (daily ed. Jan. 30, 1986) (statement of Rep. Anthony Beilenson (D-Cal.)).

[5] Representative Lott noted, "(t)his legislation is the result of committee findings that the mentally ill have been subjected to serious abuse and neglect in institutions, including physical, emotional and sexual abuse." 132 Cong. Rec. H204-03 (daily ed. Jan. 30, 1986) (statement of Rep. Trent Lott (R-Miss.)); see also S. Rep. No. 99-109, at 2 (1985) (documenting the need for legislation). Sadly, numerous reports of abuse and neglect at institutions for mentally ill or disabled individuals still exist today. In 2007, for example, the Atlanta-Journal Constitution published a ten part series of articles concerning Georgia's mental health system. The series revealed that from 2002 until 2007, more than 100 patients of Georgia's state psychiatric hospitals had died under suspicious circumstances. See, e.g., Alan Judd & Andy Miller, Sarah Crider was among 115 patients in the state's care who might have lived, (A Hidden Shame, Part One), THE ATLANTA JOURNAL-CONSTITUTION, Jan. 7, 2007; see also Joseph Shapiro, Abuse At Texas Institutions Is Beyond 'Fight Club,' NPR, Mar. 17, 2009 (detailing abuse by forcing patients to fight one another at a facility for the "entertainment" of hospital employees).

ADVOCACY FOR MENTALLY ILL INDIVIDUALS AMENDMENTS ACT OF 1991, Pub. L. No. 102-173, 105 Stat. 1217; CHILDREN'S HEALTH ACT OF 2000, Pub. L. 106-310, 114 Stat. 1101, 1194; DEVELOPMENTAL DISABILITIES ASSISTANCE AND BILL OF RIGHTS ACT OF 2000, Pub. L. 106-402, 114 Stat. 1677, 1739. Originally, the statute contemplated only individuals who suffered from mental illness and resided in a facility providing treatment. PAMII's current definition of "individuals with mental illness" includes anyone with "a significant mental illness or emotional impairment, as determined by a mental health professional" regardless of where that person resides. 42 U.S.C. § 10802(4).

Throughout PAMII's legislative history, Congress has maintained and reiterated the importance of P&As for individuals with mental illness. See, e.g., PROTECTION AND ADVOCACY FOR MENTALLY ILL INDIVIDUALS ACT OF 1986, S. Rep. No. 109, 99TH Cong., 1ST Sess. 1985, 1986 U.S.C.C.A.N. 1361, 1370 ("The Committee recognizes the need for full [P&A] access to facilities and clients and to their records in order to ensure the protection of mentally ill persons."). Congress has clearly stated that it:

> [E]xpects that facilities will provide the [P&A] system with reasonable access to all inpatients and residents in such facilities to enable the systems to inform all such individuals of their rights under Federal and State law and the U.S. Constitution and to explain the nature and scope of the system's authority under the Act. Informing a mentally ill individual of his or her rights is a critical function of a protection and advocacy system.

PROTECTION & ADVOCACY FOR MENTALLY ILL INDIVIDUALS ACT OF 1988, S.

Rep. 100-454, at 11 (1988) reprinted in 1988 U.S.C.C.A.N. 3217, 3227; see also H.R. Rep. No. 102-319 (1991), reprinted in 1991 U.S.C.C.A.N. 777, 778 (discussing amendments and purpose of PAMII).

In addition to the statutes and corresponding legislative history, there are also regulations implementing PAMII. In 1997, the Department of Health and Human Services ("DHHS") published the regulations in a final rule. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION; REQUIREMENTS APPLICABLE TO PROTECTION AND ADVOCACY OF INDIVIDUALS WITH MENTAL ILLNESS; Final Rule, 62 Fed. Reg. 53,548-01 (Oct. 15, 1997) (to be codified at 42 C.F.R. part 51). When adopting the PAMII regulations, DHHS explained, "monitoring compliance with patient rights is an opportunity to prevent incidents from occurring and to ensure that facility staff, as well as residents, understand what their rights are." 62 Fed. Reg. at 53,561. And, "while an investigation involves access to facilities, [P&A] systems have authority in their monitoring role to access facilities regardless of whether or not a complaint has been registered or probable cause exits." 62 Fed. Reg. at 53,551 – 552. "Determination of 'probable cause' may result from P&A system monitoring or other activities, including observation by P&A system personnel, and reviews of monitoring and other reports prepared by others whether pertaining to individuals with mental illness or to general conditions affecting their health or safety." 42 C.F.R. § 51.31(g).

DHHS further explained in the rule that "reasonable access" means

access during all hours and shifts, and not only on weekdays during facility "business hours." 62 Fed. Reg. at 53,561; <u>see also</u> 42 C.F.R. § 51.42(c) (discussing "reasonable access" to facilities). Access "should be to all areas used by residents or accessible to residents. Access is afforded [to the P&A] in order to monitor compliance with respect to the rights and safety of residents." 62 Fed. Reg. at 53,561; see also 42 C.F.R. § 51.42(b) (discussing access to facilities). "Residents include adults or minors who have legal guardians or conservators." 42 C.F.R. § 51.42(c). "The intent of the regulations" is clear, P&A systems must "have full unaccompanied access to residents and to all areas of the facility accessible to residents. In the interest of safety, access to certain nonpublic areas or to certain residents may be restricted by the facility but only in accordance with the procedures stipulated in section [42 C.F.R. section] 51.43 (Denial or Delay of Access)." 62 Fed. Reg. at 53,561.

## C. PAIR

PAIR extends P&A services to individuals not otherwise afforded PADD or PAMII protection. 29 U.S.C. § 794e(a)(1); 34 C.F.R. §§ 381.1, 381.5(b). Although enacted earlier, Congress fully funded the PAIR program in 1993. REHABILITATION ACT AMENDMENTS OF 1993, Pub. L. 103–73, 107 Stat. 718. PAIR grants the "same general authorities, including access to records and program income, as are set forth in [PADD]; [and] the authority to pursue legal, administrative, and other appropriate remedies or

approaches to ensure the protection of, and advocacy for, the rights of [certain] individuals." 29 U.S.C. § 794e(f)(2)–(3). The wide range of disabilities encompassed by PAIR may include, for example, certain persons with physical or sensory disabilities (such as blindness or deafness), some persons with traumatic head injuries incurred after age 22, individuals with neurological impairments such as muscular dystrophy or multiple sclerosis, or some persons with learning disabilities. See, e.g., Doe v. Stincer, 175 F.3d 879, 883 (11th Cir. 1999) ("PAIR authorizes [P&A] organizations . . . to provide services to individuals with disabilities who are not eligible for services under pre-existing [P&A] legislation, including PAMII."); Tenn. Protection & Advocacy, Inc., 371 F.3d at 351 (discussing how individuals with traumatic brain injuries may be covered by the P&A statutory scheme). As a result, PAIR extends the reach of P&As, which allows them to serve more individuals. With these PADD, PAMII, and PAIR statutes and regulations in mind, the Court turns to the legal analysis.

IV.    **ANALYSIS**

   **A. JURISDICTION**

This Court has jurisdiction over this action because it arises under federal law. 28 U.S.C. § 1331. Furthermore, ADAP has standing because it seeks to establish that SafetyNet's actions are causing injury to the P&A system itself. (Doc. 1, p. 10); Stincer, 175 F.3d at 884 (citing Tarwater Developmental Ctr., 97 F.3d 492).

## B. PADD, PAMII, and PAIR APPLY TO THE SAFETYNET FACILITY

Courts have found that P&A systems need not "make a threshold showing" of mental illness or developmental disabilities in order to exercise their access authority. See J.H. ex rel. Gray v. Hinds Cnty., Miss., No. 3:11-CV-327-DPJ-FKB, 2011 WL 3047667, at *4 (S.D. Miss. July 25, 2011); Disability Rights Wash. v. Penrith Farms, No. CV-09-024-JLQ, 2009 WL 777737, at *3 (E.D. Wash. Mar. 20, 2009); Protection & Advocacy for Persons with Disabilities v. Armstrong, 266 F. Supp. 2d 303, 313 (D. Conn. 2003); Ky. Protection & Advocacy Div. v. Hall, No. CIV.A.3:01CV-538-H, 2001 WL 34792531, at *1 (W.D. Ky. Sept. 24, 2001); Mich. Protection & Advocacy Serv. v. Miller, 849 F. Supp. 1202, 1207 (W.D. Mich. 1994). Instead of requiring conclusive evidence that a particular person or persons qualifies as an individual with mental illness or developmentally disability for the purposes of PADD, PAMII, or PAIR, courts have held that a showing of "substantial evidence" suffices. Mich. Protection & Advocacy Serv. at 1207. "'[E]vidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill[,] is sufficient under PAMII to merit access by [the P&A].'" Protection & Advocacy for Persons with Disabilities, 266 F. Supp. 2d at 314 (quoting Ky. Prot. & Advocacy Div., 2001 WL 34792531, at *3 (W.D. Ky. Sept. 24, 2001)).

There is no question that SafetyNet houses and treats individuals with

mental illness in its intensive program, thus it is subject to PAMII. There is also evidence that some residents in the moderate program may suffer from mental illness or developmental disabilities based on the diagnoses of those residents and their need for involved, daily care and support. (Doc. 63, Exh. 2, p. 24; Doc. 70, pp. 2 – 4). Moreover, PAIR expands on the rights and protections created by PAMII and PADD, and includes individuals with disabilities who do not otherwise qualify for services under those statutes. 29 U.S.C. § 794e. If a child diagnosed with "major depressive disorder" or "pervasive developmental disorder," for example, is not considered disabled for the purposes of PADD or to have a mental illness for the purposes of PAMII, that child may nevertheless be subject to PAIR. Regardless, ADAP is entitled access to the intensive and moderate programs at SafetyNet in accordance with PAMII.

DHR, however, tries to argue that "the plain meaning of the statutes" differentiates between "severe" and "moderate" mental illness or disability, and individuals with only "moderate" illness or disability are not afforded P&A protection. (Doc. 65, pp. 33 – 35). For this argument, DHR contends "significant mental illness," 42 U.S.C. § 10802(4), and "severe, chronic disability," 42 U.S.C. § 15002(8)(A), means "more than just a diagnosis." (Doc. 65, pp. 31 - 36, 43; Doc. 72, pp. 13, 15). The Court disagrees, and finds that the statutes and regulations do not state that individuals with "moderate" mental illness or developmental disability are excluded from P&A services.

Nothing in the legislative history of the P&A system suggests that Congress sought to restrict P&As from serving individuals with "moderate" mental illness or disabilities. To the contrary, the statutes and regulations speak of general access to residents and facilities, e.g., 42 C.F.R. § 51.42(c), and the definitions of mental illness and developmental disability are intentionally broad in scope. Congress also expanded P&A reach by enacting PAIR to specifically cover individuals not protected by PADD or PAMII. DHR's argument that moderately ill or developmentally disabled individuals are excluded from P&A oversight is without merit.

Furthermore, assuming for the sake of argument that the law requires "more than just a diagnosis," that heightened standard is met here. Residents in the moderate program receive regular care and instruction on "basic living skills for a minimum of 2 hours daily," counseling, medication, mental consultations, bi-weekly contact with a therapist, and bi-weekly group therapy, among other things. (Doc. 65, pp. 18 – 19). Residents are placed in the moderate program because the "child's needs can only be met in a more restrictive placement." (Doc. 65, p. 12; Doc. 66, Exh. 15, pp. 17, 36). The residents thus need care that extends beyond a mere diagnosis, and they receive several treatment options and individualized service plans for their behavioral health needs.

Moreover, SafetyNet is operating a "facility" that provides "care or treatment" to "individuals with mental illness." 42 C.F.R. § 51.42(b).

SafetyNet is not, for instance, a hospital that is fixing broken bones on one side and providing some patients with psychiatric care on the other. (Doc. 74, p. 2). Indeed, SafetyNet exists for one purpose: to provide care and treatment for children with a variety of mental health and emotional disorders. This puts it squarely under the purview of PAMII. Nothing in the statutes, regulations, or legislative history suggests that P&A access is determined one resident at a time. Nor is P&A access limited to only those residents with the most severe mental illness, especially when SafetyNet can at any time change a child's placement to a more or less restrictive setting.

DHR also relies on Alabama's Medicaid statutes and regulations for its position. (Doc. 65, pp. 36 − 37; Doc. 77, pp. 5 − 7). The Medicaid rules do not trump PADD, PAMII, or PAIR, nor do the rules control the interpretation of these federal laws. States and state-licensed facilities must comply with federal law. See M'Culloch v. Maryland, 17 U.S. 316, 435 (1819) (discussing state laws in relation to the Supremacy Clause).

Additionally, DHR cannot successfully argue that PADD, PAMII, or PAIR do not apply to SafetyNet because certain Medicaid services are billed on an outpatient basis. (Doc. 65, p. 9). The statutes make clear that P&A systems are afforded monitoring and access rights to individuals with mental illness or disability even when they are not residing full-time in a facility. Congress designed PAMII to protect individuals with mental illness who live and receive treatment outside of inpatient treatment facilities. 42 U.S.C. §§

10802(3), (4)(B); 10841(3)(C); <u>Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.</u>, 464 F.3d 229, 240 (2d Cir. 2006) (protecting school students from abuse and neglect within educational settings). The laws also protect patients in community-run programs like outpatient facilities, boarding and group homes, homeless shelters, and even the patient's own home. 42 U.S.C. §§ 10802(3), (4)(B); 15043. The argument that ADAP cannot access the moderate program because some of the services provided by that program are considered "outpatient" services under the state Medicaid regulations fails.

It is also perplexing that DHR "thought it best to follow the <u>Tarwater</u> case to resolve issues with ADAP." (Doc. 65, p. 38). <u>Tarwater</u> is a case about records, not facility access or monitoring, and it analyzed whether an anonymous telephone call implying that abuse or neglect may have caused death constituted a "complaint" and established probable cause for purposes of gaining record access. 97 F.3d 492, 496 (11th Cir. 1996).[6] DHR and SafetyNet cannot claim that <u>Tarwater</u> applies to the moderate program, and yet deny ADAP access to monitor its facility and moderate program residents. In doing so, DHR and SafetyNet essentially decided they must comply only with some provisions of the P&A statutes and regulations. DHR and SafetyNet do not get to conveniently pick and choose which provisions of federal law they will ignore.

---

[6] Notably, PAMII and its regulations have been amended since <u>Tarwater</u>.

DHR also complains that giving ADAP "access to moderate really undermines" the work performed by SafetyNet and the state. (Doc. 72, p. 13). To be clear, the focus here is not on any party "undermining" the other. The priority remains the safety, health, and well being of SafetyNet's residents, and all individuals served by the P&A system.

## C. ADAP MAY ACCESS AND MONITOR THE MODERATE PROGRAM

Through PADD, PAMII, and PAIR, Congress created a nationwide system of organizations with a mandate to provide protection and advocacy for individuals with mental illness or disabilities. The access authority is one of the most important features of the P&A system. The three primary types of access - to individuals, their records, and the facilities or residences in which they live - are key to ensuring the P&A system fulfills its Congressional purpose. See, e.g., EXAMINING THE ISSUES RELATED TO THE CARE AND TREATMENT OF THE NATION'S INSTITUTIONALIZED MENTALLY DISABLED PERSONS: JOINT HEARINGS BEFORE THE SUBCOMM. ON THE HANDICAPPED OF THE S. COMM. ON LABOR AND HUMAN RESOURCES AND THE SUBCOMM. ON LABOR, HEALTH AND HUMAN SERVS., EDUC. AND RELATED AGENCIES OF THE COMM. ON APPROPRIATIONS, 99th Cong., 1st Sess. (1985) (Hr'g No. 99-50, pt. II). Courts have recognized that P&A access is fundamental, and P&A agencies have almost universally prevailed in litigation based on access.[7]

---

[7] See, e.g., Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist., 581

F.3d 936, 940 (9th Cir. 2009) (FERPA does not bar a P&A from obtaining access to the name and contact information for a parent, guardian, or other legal representative); Ind. Protection & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin., 603 F.3d 365, 380-81 (7th Cir. 2010) (affirming declaratory and injunctive relief for P&A); Conn. Office of Protection & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ., 464 F.3d 229 (2d Cir. 2006) (affirming injunction in favor of state agency under PAMII); Disability Rights Wis., Inc. v. State of Wis. Dep't of Pub. Instruction, 463 F.3d 719, 725 (7th Cir. 2006) (reversing denial of injunction where P&A sought records from state agency, and providing history of protection and advocacy legislation); Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction & Advocacy Servs., 448 F.3d 119 (2d Cir. 2006) (affirming injunction in favor of state agency to obtain access to patient records); Mo. Protection & Advocacy Servs. v. Mo. Dep't of Mental Health, 447 F.3d 1021 (8th Cir. 2006) (affirming injunction requiring access to patient records); Center for Legal Advocacy v. Hammons, 323 F.3d 1262 (10th Cir. 2003) (reversing denial of injunction);  Pa. Protection & Advocacy, Inc. v. Houstoun, 228 F.3d 423 (3d Cir. 2000) (affirming injunction requiring access to patient records); Miss. Protection & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054, 1059 (5th Cir. 1991) (upholding injunction in favor of P&A); Hawaii Disability Rights Ctr. v. Cheung, 513 F. Supp. 2d 1185, 1195 (D. Haw. 2007) (P&A has standing to sue and demand access to records); Ohio Legal Rights Service v. Buckeye Ranch, Inc., 365 F. Supp. 2d 877, 883–84 (S.D. Ohio 2005) (granting injunction under PAMII in favor of P&A against private caregiver); Equip for Equality, Inc. v. Ingalls Memorial Hosp., 292 F. Supp. 2d 1086 (N.D. Ill. 2003) (granting injunction against private caregiver under PAMII Act and state law); Iowa Protection & Advocacy Services, Inc. v. Gerard Treatment Programs, L.L.C., 152 F. Supp. 2d 1150 (N.D. Iowa 2001) (P&A entitled access to the records and patients in a psychiatric medical institution in connection with its investigation of possible abuse or neglect, even where the parents and guardians had indicated that they opposed such access); Wis. Coalition for Advocacy, Inc. v. Czaplewski, 131 F. Supp. 2d 1039, 1047–50 (E.D. Wis. 2001) (ordering both public and private caregivers to provide access to P&A under PAMII); Ariz. Ctr. for Disability Law v. Allen, 197 F.R.D. 689, 693 (D. Ariz. 2000) (P&A entitled to access records to make probable cause determination); Advocacy Ctr. v. Stalder, 128 F. Supp. 2d 358, 361 (M.D. La. 1999) (P&A entitled to access records); Mich. Protection & Advocacy Service, Inc. v. Miller, 849 F. Supp. 1202 (W.D. Mich. 1994) (state violated federal law by limiting P&A access to individuals and records in facilities); Robbins v. Budke, 739 F. Supp. 1479, 1487 (D.N.M. 1990) ("While 24–hour, unlimited access is not necessary to accomplish the purpose of the Act, P&A must be permitted to present regular informal patients' rights education to all patients at [Las Vegas Medical Center] who are mentally ill

Because PAMII applies to the SafetyNet facility, SafetyNet must comply with the P&A regulatory scheme. This means ADAP is authorized to monitor both the intensive and moderate programs. Furthermore, ADAP is allowed "reasonable access" to the facility as required by law. The regulations, discussed above, are helpful in outlining what is considered "reasonable." To clarify, ADAP is entitled access to the residents and facilities at SafetyNet to perform its monitoring and educating functions, despite the lack of a court order, an investigation, or a complaint. DHR and SafetyNet thwarted the purpose of the P&A system by refusing to grant ADAP any access whatsoever to the moderate program. Such inaction clearly violates federal law.

P&A access is broad, but it is not unfettered. P&As must conduct their activities "so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview." 42 C.F.R. § 51.42(c). "Reasonable access" must also take into account the distinctions between the right of access to facilities versus the right of access to patients, as well as between the right of access for monitoring purposes versus the right of access for educating or advocacy purposes. When a P&A system exercises its monitoring function, reasonable access includes unannounced access. If it is monitoring the program, the P&A system may inspect, view, and photograph those areas to which it has access,

---

or developmentally disabled.").

and photograph patients under strict guidelines. When a P&A system exercises its educating function, reasonable access does not include unannounced access. Giving at least 24-hours notice before accessing facilities and exercising this function is reasonable. DHR complained that an ADAP representative interrupted a classroom session in the intensive program to announce her name and provide materials to the residents. (Doc. 77, pp. 15 – 16). When planning to engage with residents for educating purposes, ADAP should provide notice before entering the classroom and refrain from interrupting.

Finally, this Court **ORDERS** ADAP and SafetyNet to meet and prepare a protocol with respect to situations in which ADAP requests access but lacks a court order, a complaint, or an investigation. See, e.g., Protection & Advocacy Sys., Inc. v. Freudenthal, 412 F. Supp. 2d 1211, 1212 (D. Wyo. 2006) (submitting "Access Agreement" for court approval). **This protocol must be submitted to the Court for approval no later than January 30, 2015.** Furthermore, this Court strongly encourages ADAP and DHR to develop a standard protocol that will govern to what extent ADAP will request access to a facility, and to distribute the protocol to facilities ADAP serves within Alabama. In the end, the parties in this case have the same interests in mind—the best interests of the SafetyNet residents—and should work together to serve those common interests.

### D. INJUNCTIVE RELIEF

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a district court may grant such relief. "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted). In this case, ADAP satisfies each factor. (Doc. 73, pp. 9 – 10). It has suffered an irreparable injury by being denied access to fulfill its statutorily authorized legal duty, monetary damages will not fix the problem, a remedy in equity is warranted, and the public interest is served by a permanent injunction. ADAP is awarded injunctive relief, and SafetyNet must give ADAP access to the moderate program in accordance with this Order.

### E. COSTS

ADAP and SafetyNet seek from each other an award of attorney's fees and costs. (Doc. 62, Exh. 1, p. 9; Doc. 71, p. 3; Doc. 73, p. 11; Doc. 75, p. 4). Neither party provides legal authority for awarding fees and costs in this type of dispute. The P&A statutes and regulations are silent on this issue, though the regulations provide that a P&A system receives allotments that may be used to bring lawsuits in their own right to redress incidents of abuse

or neglect, discrimination, and other violations. 45 C.F.R. § 1386.25.

Generally, litigants are expected to bear their own attorney's fees and costs

pursuant to the "American Rule." Mayer v. Wall St. Equity Grp., Inc., 514 F.

App'x 929, 932 (11th Cir. 2013). Because neither party cites an applicable

exception to this rule, the Court finds that each party must bear its own

costs.

## F. INDEMNIFICATION AND CONTRIBUTION

SafetyNet is not entitled to indemnification and contribution from

DHR as a matter of law.[8] SafetyNet seeks indemnification and contribution

from DHR because SafetyNet followed DHR's instructions to deny ADAP

access to the moderate program. To support its position, SafetyNet states,

"ADAP has not and cannot provide any Alabama precedent or statutory

authority that would legally compel SafetyNet to disregard instructions from

[DHR], the governmental agency which licenses SafetyNet." (Doc. 62, Exh. 1,

pp. 5, 8). SafetyNet also argues DHR could have revoked SafetyNet's license

or refused to renew their contract should it fail to follow DHR's directive.

(Doc. 62, Exh. 1, p. 7). SafetyNet cites its contract with DHR to support the

---

[8]     Eleventh Amendment Immunity is not at issue here. The Supreme
Court "has consistently held that an unconsenting State is immune from
suits brought in federal courts by her own citizens as well as by citizens of
another State." Edelman v. Jordan, 415 U.S. 651, 662–63 (1974) (internal
citations omitted). If properly raised, the Eleventh Amendment bars actions
in federal court against a state, state agencies, or state officials acting in
their official capacities. Id. at 663. By failing to raise this Eleventh
Amendment issue, DHR waived this non-jurisdictional defense. See Wisc.
Dep't of Corrections v. Schacht, 524 U.S. 381, 389 (1998).

fact that it agreed "to adhere to DHR policies and requirements, which have been provided to [SafetyNet]." (Doc. 62, Exh. 1, p. 8). Because SafetyNet followed DHR's instructions, SafetyNet argues equity and fairness favor awarding it indemnification and contribution from DHR.

The Court first notes SafetyNet is required to follow federal law. To argue indemnification is required because ADAP did not provide SafetyNet with any Alabama precedent or statutory authority saying it could ignore DHR's instructions is erroneous. ADAP wrote to SafetyNet explaining its authority, and provided SafetyNet with citations to federal law supporting its position. ADAP cannot provide SafetyNet with Alabama precedent or statutory authority that contravenes the Supremacy Clause, *i.e.*, telling SafetyNet it must adhere to instructions from a state agency even when those instructions violate federal law, because such precedent does not exist. See Const. Art. VI cl. 2; PLIVA, Inc. v. Mensing, 131 S. Ct. 2567, 2577 (2011) (explaining when the Supremacy Clause of the U.S. Constitution mandates state law give way to federal statute); Iowa Protection & Advocacy Servs., Inc. v. Rasmussen, 206 F.R.D. 630, 639 (S.D. Iowa 2001) ("In the case of [PAMII], the state law is expressly preempted."). Though it is unfortunate SafetyNet and DHR failed to understand the federal rules and regulations applicable to this dispute, this lack of understanding does not entitle SafetyNet to indemnification.

Second, nothing in the record supports the notion that DHR

threatened retaliation against SafetyNet should it allow ADAP access to the moderate program. (Doc. 76). SafetyNet merely argues its contract with DHR requires compliance, "and non-compliance could result in [DHR] revoking SafetyNet's license." (Doc. 62, Exh. 2, p. 3). Nor does the record show SafetyNet objected to DHR's instructions, or promptly sought independent legal counsel or mediation to help resolve this dispute. Instead, the record shows that for twelve months ADAP tried to gain access to the moderate program, only to have SafetyNet refuse them. SafetyNet was not without options. Only after a year of being denied access did ADAP file this lawsuit. Additionally, SafetyNet, as a behavioral health care facility, is responsible for understanding and following the federal and state laws that apply to its programs. It cannot use DHR's flawed guidance as an impenetrable shield for its own violations.

Finally, the contract requires the parties to adhere to DHR policies and requirements. (Doc. 62, Exh. 1, p. 8). But the contract does not authorize the parties to violate federal law. To the contrary, the contract states more than once that SafetyNet must "comply with all federal, state, and local laws." (Doc. 66, Exh. 16, pp. 6, 9, 11). Moreover, the contract and RFPs refer repeatedly to Alabama's Medicaid manual and regulations, and Alabama's Medicaid program must be administered in compliance with federal law.[9]

---

[9]     As the Eleventh Circuit has explained, "Medicaid is a cooperative venture of the state and federal governments. A state which chooses to participate in Medicaid submits a state plan for the funding of medical

Simply put, SafetyNet and DHR cannot contract their way out of compliance with the applicable federal rules, and nothing in the record suggests that they attempted to do so. Instead it appears that DHR and SafetyNet did not understand the P&A broad remedial framework, and this led to violations of federal law. For the foregoing reasons, SafetyNet is not entitled to indemnity and contribution from DHR.

## CONCLUSION

After careful consideration, the Court finds that there is no genuine dispute as to any material fact and ADAP is entitled to judgment as a matter of law. SafetyNet's complete refusal to allow ADAP to access its moderate program violates PAMII. ADAP is entitled to reasonable unaccompanied access to both programs at SafetyNet, as well as the patients and programs therein. ADAP's motion for summary judgment is therefore **GRANTED**, and SafetyNet's motion for summary judgment is **DENIED**. DHR's motion for summary judgment is **DENIED,** but SafetyNet is not entitled to indemnification and contribution from DHR. ADAP and SafetyNet are required to meet and to develop a protocol consistent with this order for presentation to the Court no later than **January 30, 2015**. Declaratory judgment, therefore, is entered against SafetyNet, and SafetyNet is hereby

---

services for the needy which is approved by the federal government. The federal government then subsidizes a certain portion of the financial obligations which the state has agreed to bear. A state participating in Medicaid must comply with [the applicable federal laws]. <u>Harris v. James</u>, 127 F.3d 993, 996 (11th Cir. 1997) (citations and quotations omitted).

permanently enjoined from denying ADAP reasonable access to its intensive and moderate programs located at the Minter, Alabama facility. A separate judgment will be entered.  This Court retains jurisdiction to enforce the injunction.

**DONE** and **ORDERED** this 12th day of December, 2014.

/s/ Callie V.S. Granade
UNITED STATES DISTRICT JUDGE