# EXHIBIT A

ADAP v. SafetyNet

01.30.15

ADAP Monitoring, Visitation and Record Access Procedures
For SafetyNet YouthCare, Inc. Facilities

# ALABAMA DISABILITIES ADVOCACY PROGRAM (ADAP)
# MONITORING, VISITATION AND RECORD ACCESS PROCEDURES
# FOR
# SAFETYNET YOUTHCARE, INC. (SAFETYNET) FACILITIES

## Section I

## Introduction

Protection and advocacy ("P&A") agencies are federally mandated to provide legal and other advocacy services on behalf of persons with disabilities, including persons with mental illness and persons with developmental disabilities. They are authorized to investigate potential abuse or neglect impacting such persons and to monitor their health and safety in both institutional and community settings. They are also authorized to pursue legal, administrative and other remedies and other approaches to ensure the protection of the rights of persons with disabilities. These authorities are conferred under federal statutes, including the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.,* and its implementing regulations at 42 C.F.R. § 51; the Protection and Advocacy for Individuals with Developmental Disabilities Act ("PADD Act"), and its implementing regulations at 42 U.S.C. § § 15041 *et seq.*, 45 C.F.R. § 1386 *et seq.*; and the Protection and Advocacy for Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e and its implementing regulations at 34 C.F.R. § 381. These statutes will be referred to collectively as "the P & A Acts."

1

## Section II

### Visitation -- Monitoring and Training

1. <u>Introduction</u>

   ADAP monitors SafetyNet facilities to observe and identify policies or procedures; environmental, staffing, or service planning issues; staff-on-youth and youth-on-youth interactions; and, other general conditions or circumstances that could impact the safety and rights of youth served by SafetyNet.[1]  In addition, ADAP conducts informational visits to SafetyNet facilities to provide information on legal rights to youth – both in general and in relation to the particular circumstances of an individual youth.[2]

2. <u>Notice Required</u>

   ADAP will provide SafetyNet seven days advance written notice for ADAP's monitoring activities.  Such notice will include the names of the individuals who will have access, the name of the facility and the date and the approximate time ADAP will be on-site.[3]

3. <u>Notice to Whom</u>

   ADAP will contact the identified SafetyNet staff member at each facility to set up monitoring visits.  Upon adoption of this protocol, SafetyNet and ADAP will exchange agency and contact information, including the relevant contact names, telephone numbers, facsimile numbers and mailing addresses for each SafetyNet facility.  The parties will update such information as necessary.

4. <u>Hours</u>

   ADAP is authorized to have access at all reasonable times, which, at a minimum, shall include normal working hours and visiting hours.[4]   While after-hour visits (e.g. third shift

visits) will be permitted with notice, as outlined above, it is anticipated that the majority of ADAP's monitoring and training visits will occur during normal working and visiting hours.

5. <u>Scope of Facility Access</u>

ADAP monitors SafetyNet facilities to observe and identify policies or procedures; environmental, staffing, or service planning issues; staff-on-youth and youth-on-youth interactions; and, other general conditions or circumstances that could impact the safety and rights of youth served by SafetyNet.[5] In addition, ADAP conducts informational visits to SafetyNet facilities to provide information on legal rights to youth – both in general and in relation to the particular circumstances of an individual youth.[6]

ADAP staff may meet youth individually or in groups, with or without a request from the youth or their families, during monitoring visits. ADAP may also request individual SafetyNet staff to speak with ADAP.

ADAP will conduct its monitoring in a manner that:

a. minimizes interference with the facility's programs;[1]

b. respects the legitimate privacy interests of youth and facility staff;

c. honors a youth's request to terminate an interview; and

d. honors a SafetyNet staff member's refusal to speak with ADAP for other than routine scheduling or procedural matters.[7]

ADAP's monitoring activities reflect ADAP's statutory mandate to:

a. interact regularly with those individuals who are current or potential recipients of P&A services;

b. interact regularly with staff providing care or treatment;

---

[1] For example, when monitoring a SafetyNet classroom or other program, ADAP staff will not interrupt the class or program to make any announcements. If ADAP staff wants to make a brief announcement, ADAP staff will wait until the conclusion of the class or program to do so.

    c.  obtain information and review records (See Section V for more detail); and

    d.  communicate with family members, social and community service workers and others involved in providing care or treatment.[8]

6.   <u>SafetyNet Oversight of ADAP Staff and Interviewees</u>

    ADAP shall have private and unaccompanied access to meet and communicate privately with youth served by SafetyNet regularly, both formally and informally.

    To encourage dialogue between youth and ADAP staff, SafetyNet may not pre-screen youth before they talk with ADAP staff during a monitoring visit. SafetyNet may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP. Further, SafetyNet may not conduct post-interview debriefings of youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent SafetyNet staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect.[9]

7.   <u>ADAP Staff Obligations</u>

    To protect the safety and rights of individuals with disabilities in SafetyNet facilities, ADAP will, as soon as feasible, advise SafetyNet staff of safety or rights violations revealed through its monitoring.

8.   <u>SafetyNet Obligation if Access is Denied or Delayed</u>

    If ADAP access to facilities, programs, youth, or records are denied or delayed, ADAP will promptly contact SafetyNet Legal Counsel. SafetyNet must promptly provide ADAP with a written statement of the reasons for such denial or delay.[10]

## Part III

### Visitation -- Visiting with Youth who are Current or Potential Clients

### of Protection and Advocacy Services

1. <u>Introduction</u>

   An ADAP lawyer or advocate may meet and confer with his client or potential client regarding confidential matters.  ADAP will certify in writing that a youth is a client or potential client, including the basis (if known at the time) upon which ADAP concludes the youth is an individual with a disability.

2. <u>Notice Required</u>

   ADAP will endeavor to provide reasonable advance notice (24-48 hours) when it seeks to meet with ADAP clients (or potential clients) with the understanding that emergency or exigent situations may arise that prevent such notification.   ADAP will endeavor to provide written notification to the Guardian Ad Litem (GAL) of the youth notifying the GAL that ADAP has scheduled to talk privately with a youth.  SafetyNet will provide GAL contact information to ADAP to facilitate this communication.

3. <u>Notice to Whom</u>

   ADAP will contact the identified SafetyNet staff member at each facility to set up client visits.  Upon adoption of this protocol, SafetyNet and ADAP will exchange agency contact information, including the relevant contact names, telephone numbers, facsimile numbers and mailing addresses for each SafetyNet facility.  The parties will update such information as necessary.

4.   Hours

ADAP is authorized to have access at all reasonable times, which, at a minimum, shall include normal working hours and visiting hours.[11]   While after-hour visits (e.g. third shift visits) will be permitted, it is anticipated that the majority of ADAP's visits with current or potential clients will occur during normal working and visiting hours.

5.   Location of Visits

ADAP client (or potential client) visits will take place in each facility's administration building.

6.   On-Site Supervision of ADAP Staff

ADAP shall have private and unaccompanied access to meet and communicate privately with clients (or potential clients), both formally and informally.  Among other reasons, these meetings may be needed to ascertain a youth's eligibility for ADAP's services;[12] to conduct a preliminary assessment regarding an eligible resident's concerns; to provide information about ADAP; or to discuss matters related to ADAP's representation of the individual.[13]

To encourage dialogue between youth and ADAP staff, SafetyNet may not pre-screen youth before they talk with ADAP staff.  SafetyNet may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP.  Further, SafetyNet may not conduct post-interview debriefings with youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent  SafetyNet staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect. [14]

7.  Off-Site Communication between ADAP and Facility Youth

    ADAP shall have access to youth, both formally and informally, by telephone and mail.[15] All such conversations and correspondence shall be afforded the confidentiality given to legal or judicial interactions.

8.  ADAP Staff Obligations

    ADAP will conduct its visits in a manner that:

a.  minimizes interference with the facility's programs;

b.  respects the legitimate privacy interests of youth and facility staff;

c.  honors a youth's request to terminate an interview;[16]

d.  honors a SafetyNet staff person's refusal to speak with ADAP for other than routine scheduling or procedural matters; and

e.  abides by security policies of SafetyNet facilities.

    To protect the safety and rights of individuals with disabilities in SafetyNet facilities, ADAP will, as soon as feasible, advise SafetyNet staff of safety or rights violations revealed through its client representation.

9.  SafetyNet Obligation if Access is Denied or Delayed

    If ADAP access to facilities, programs, youth, or records are denied or delayed, ADAP will promptly notify SafetyNet Legal Counsel. SafetyNet must promptly provide ADAP with a written statement of the reasons for such denial or delay.[17]

**Part IV**

**Investigations**

1.  Introduction

ADAP conducts investigations[18] of alleged incidents of abuse or neglect at SafetyNet facilities when it receives a complaint of such incidents, when it makes a probable cause determination that such incidents have occurred, or when ADAP determines that there is or may be imminent danger of serious abuse or neglect of an individual with a disability.[19]

2.  Complaint

A complaint includes, but is not limited to, any report or communication, whether formal or informal, written or oral, received by ADAP, including media accounts, newspaper articles, telephone calls (including anonymous calls) from any source alleging abuse or neglect of an individual.[20]

3.  Probable Cause

Probable cause means reasonable grounds for belief that an individual with a disability has been, or may be at significant risk of being subject to abuse or neglect. ADAP makes this determination basing the decision on reasonable inferences drawn from its experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.[21]

ADAP's determination of probable cause may result from its monitoring or other activities, including observation by ADAP personnel and reviews of monitoring and other reports prepared by others whether pertaining to individuals disabilities or to general conditions affecting their health or safety.[22]

8

SafetyNet reserves the right to contest ADAP's statement of probable cause and to file with the appropriate court a motion for injunctive, declaratory or other applicable relief. Despite the foregoing reservation, ADAP affirms its position that statutory, regulatory and case law hold that a determination of probable cause is within ADAP's discretion alone.

4. Notice

By statute, regulation and case law, ADAP is not required to give advance notice to access a facility, its employees or to youth served by the facility in order to conduct an investigation of suspected abuse or neglect.[23] However, ADAP will provide 72 hours advance written notice to conduct investigatory activities, except in emergency or exigent situations. The notice will include the name of the youth; a statement of ADAP's determination of the youth's eligibility for services under ADAP's enabling statutes; and a brief summary of the facts upon which probable cause is based.[24] The notice will be signed by an ADAP staff member with knowledge of the facts. Notice will be provided to the identified SafetyNet facility staff person.

5. Hours

ADAP shall endeavor to conduct all investigations during normal business hours. However, in emergency situations, ADAP will have reasonable unaccompanied access at all times necessary to conduct a full investigation of an incident of abuse or neglect, including night and weekend hours.[25]

6. Where in Facility

During an investigation, ADAP personnel shall have reasonable unaccompanied access to all areas of the facility which are used by youth or are accessible to youth.[26] This authority includes the right to inspect, view and photograph all areas of a facility's premises that might

9

be reasonably believed by ADAP to have been connected with the incident under investigation.[27]

7.  Access to Residents

During an investigation, ADAP personnel shall have reasonable unaccompanied access to youth and facility staff.[28] This access shall include the opportunity: to interview any youth, employee, or other person, including the person thought to be the victim of an incident of abuse or neglect or who might be reasonably believed by ADAP to have knowledge of the incident under investigation.[29]

To encourage dialogue between youth and ADAP staff, SafetyNet may not pre-screen youth before they talk with ADAP staff during an investigation. SafetyNet may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP. Further, SafetyNet may not conduct post-interview debriefings with youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent SafetyNet staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect.[30]

8.  Access to Records

ADAP staff will have access to the records of a youth who is the subject of an investigation being conducted pursuant to this Section. For further information on record access, see Section V.

9.  On-Site Supervision of ADAP Staff

ADAP shall have private and unaccompanied access to meet and communicate privately with youth.[31]

10.  ADAP Staff Obligations

   ADAP will conduct its investigatory visits in a manner that:

   a.   minimizes interference with the facility's programs;

   b.   respects the legitimate privacy interests of youth and facility staff;

   c.   honors a youth's request to terminate an interview; and

   d.   honors a SafetyNet staff person's refusal to speak with ADAP for other than routine
        scheduling or procedural matters.[32]

   To protect the safety and rights of individuals with disabilities in SafetyNet facilities,

   ADAP will, as soon as feasible, advise SafetyNet staff of safety or rights violations revealed

   through its investigations.

11.  SafetyNet Obligation if Access is Denied or Delayed

   If ADAP access to facilities, programs, residents, or records are denied or delayed, ADAP

   will promptly notify SafetyNet Legal Counsel.  SafetyNet must promptly provide ADAP with

   a written statement of the reasons for such denial or delay.[33]

11

## Part V

### Record Access

1.   Request Procedure

ADAP will provide the facility administrator with a written request for a youth's record. If applicable, the request will include a release signed by the youth's parent or legal guardian.

ADAP will certify in the written request if the purpose of the record review is in furtherance of an investigation conducted pursuant to Section IV.  In such a situation a release signed by the youth's parent or legal guardian is not required.

ADAP is not required to provide a conclusive, individualized showing of an individual's disability before being allowed access to the records.

2.   On-site Review

Upon presentation of the written request, ADAP staff will have immediate access to records which are available at the facility.[34]

Under no circumstances will ADAP staff remove the original record or any part thereof from the control of the facility or add or make changes to the record.  Any problems with an ADAP staff member's handling of the records should be reported to the ADAP Executive Director.

3.   Photocopies of Records

SafetyNet will provide space for ADAP to set up its own copier or scanner on site to photocopy records.  In those instances in which SafetyNet provides ADAP with copies of requested records, ADAP will pay five cents per copied page. If a death has occurred or if ADAP asserts probable cause of serious and immediate jeopardy to the health or safety of an

individual, copies must be provided to the ADAP staff member making the request within 24 hours.[35]

4.   <u>Definition of Records</u>[36]

a.   Information and individual records, obtained in the course of providing intake, assessment, evaluation, supportive and other services, including medical records, financial records, and reports prepared or received by a member of the staff of a facility or program rendering care or treatment.

b.   Reports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities, except that nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees.

c.   Discharge planning records.

d.   Professional, performance, building or other safety standards, demographic and statistical information relating to the facility.

e.   Reports prepared by an agency charged with investigating abuse neglect, or injury occurring at a facility rendering care or treatment, or by or for the facility itself, that describe any or all of the following:

i.   Abuse, neglect, or injury occurring at the facility;

ii.   The steps taken to investigate the incidents;

iii.   Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or

    iv.    Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

5.   <u>Duty to Maintain Confidentiality of Records</u>

    ADAP will maintain the confidentiality of records and information regarding residents and will only use such information as necessary to fulfill its own duties under the law. ADAP will maintain the confidentiality of records provided to it to the same extent as is required of SafetyNet under the laws of both the State of Alabama and the United States of America. ADAP will not release or disclose to a third party any individual records without the authorization of the individual or his/her guardian.

    Personal Identifiable Information (PII) ADAP obtains from SafetyNet in the course of communicating with clients and potential clients, and through monitoring and investigations ADAP conducts pursuant to ADAP's federal access authority, is protected from disclosure to third parties per the Alabama Rules of Professional Conduct, ADAP's enabling statutes and implementing regulations (PADD, PAIMI, and PAIR), attorney client privilege, and the attorney- work product doctrine. Nothing in this agreement, however, prohibits ADAP from disclosing PII if demanded by subpoena from a legally authorized federal or state agency. ADAP is obligated to release to an ADAP client information in the client's file at the client's request. Nonetheless, ADAP must keep confidential information pertaining to individuals to the same extent as is required under Federal or State law for a provider of mental health services, except as provided for under 42 C.F.R. §51.46.

## Part VI

### Miscellaneous

1. ADAP will abide by the Alabama Rules of Professional Conduct in its interactions with clients and potential clients of its services at ADAP.

2. Nothing in this protocol shall be construed to bar either SafetyNet or ADAP from seeking injunctive, declaratory or other relief from an appropriate court.

3. ADAP and SafetyNet consent to the following-described procedure for resolving any disputes regarding this agreement:

   a. If either party reasonably believes that the other party is not complying with this agreement, the party will notify the other in writing regarding the nature of the alleged non-compliance and will propose recommended corrective action. Not less than 10 days after the receipt of this notice, the parties shall confer in a good-faith effort to resolve the matter. If they fail to reach an agreement which resolves the dispute, either ADAP or SafetyNet may request that the Court appoint a Mediator.

   b. This procedure shall be deemed a condition precedent to either party's filing of any enforcement motion with the District Court, except that it shall not be construed to bar ADAP from seeking immediate judicial relief upon a reasonable belief that a SafetyNet youth is threatened by an imminent or continuing risk of serious harm, and that SafetyNet cannot, or will not, eradicate or minimize such risk effectively, regardless of prior notice.

  c. For the purpose of this provision, "risk of serious harm" shall refer to an imminent threat to life or personal safety as a result of physical or emotional abuse, extreme neglect, physical injury, sexual exploitation or sexual assault.

4. The parties shall review this protocol annually, on or about January 30.

5. Either party may, with thirty days written notice to the other party, withdraw its consent to be bound by the terms of the protocol.

6. It is the intent of the parties that all issues relating to access by ADAP, statutory or otherwise, to SafetyNet facilities are resolved in this agreement.

# Endnotes

[1] 45 C.F.R. § 1386.22(g)(2); 42 C.F.R. § 51.42(c)(2).

[2] 45 C.F.R. § 1386.22(g)(1); 42 C.F.R. § 51.42(c)(1).

[3] PAIMI regulation interpretive guidance states that in non-emergency (i.e. non-investigative) situations, advance notice to a facility may be reasonable but the guidance does not describe when it would be appropriate to provide advance notice and no description of what constitutes reasonable notice. 62 F.R. 53561. Cases in which courts have required no advance notice to a facility to conduct monitoring or training activities include: *Pennsylvania Protection and Advocacy, Inc. v Royer-Greaves School for the Blind*, 1999 WL 179797, at *6 (E.D. Pa. March 25, 1999) (P&As shall be afforded access to conduct facility monitoring activities without advance notice); *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990) (the P&A's ability to observe conditions to which patients are subject is "seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon."). In those situations when courts have required advance notice (with exceptions for emergency situations), that notice has been limited to 24 – 48 hours: *Protection and Advocacy, Inc. v. Freudenthal*, 412 F. Supp. 2d 1211 (D. Wy. 2006) (court-approved access agreement stated that the P&A was required to make monitoring requests in writing at least two business days prior to the intended visit, except in emergencies); *Oregon Advocacy Center v. SCAR/Jasper Mountain et al.*, No. 06-6229-TC (D. Oregon, Dec. 13, 2006) (24-hour advance notice to provider or the written approval of the court in advance of an unannounced monitoring visit).

[4] 45 C.F.R. §1386.22(g); 42 C.F.R. § 51.42(c).

[5] 45 C.F.R. § 1386.22(g)(2); 42 C.F.R. § 51.42(c)(2).

[6] 45 C.F.R. § 1386.22(g)(1); 42 C.F.R. § 51.42(c)(1).

[7] 42 C.F.R. § 51.42(c).

[8] 42 C.F.R. § 51.31(d). *See* S. Rep. 120, 103rd Cong., 1st Sess. 36, reprinted in 1994 U.S. Code Cong. & Admin. News 164, 199 (stating Congress's intent that P&A access "assure that the most vulnerable individuals [institutionalized persons] who may not be able to contact the P&A system will have access to protection and advocacy services."

[9] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d). PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [Substance Abuse Mental Health Services Administration, hereinafter "SAMHSA"] agrees that private and unaccompanied access to clients and other residents should be provided and that, if

17

denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562. Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations. P&A's ability to even observe the conditions that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect the rights of [facility] residents and of providing the necessary information to them."). Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id.*

[10] 42 C.F.R. § 51.43.

[11] 45 C.F.R. §1386.22(g); 42 C.F.R. § 51.42(c).

[12] To be eligible for ADAP's individual case advocacy services all four of the following statements must be true: 1) the individual with a disability must be eligible under one of ADAP's programs (Protection and Advocacy for Persons with Developmental Disabilities [PADD], Protection and Advocacy for Persons with Mental Illness [PAIMI], Protection and Advocacy Individual Rights [PAIR], Protection and Advocacy for Assistive Technology [PAAT], and Protection and Advocacy for Persons with Traumatic Brain Injury [PATBI]); 2) the individual's situation must involve the abuse or neglect of a person with disability, a violation of a right granted to a person because that person has a disability, or discrimination based on disability; 3) accepting the individual's case for advocacy services will further one of ADAP's annual priorities and 4) the individual's situation must meet other case selection criteria, which includes such considerations as the availability of other competent resources to advocate on behalf of the individual (including the individual's ability to pay for other legal services, or the individual's ability to advocate on his/her own behalf); whether there is a realistic prospect of success if the case is selected; the extent to which the potential client will benefit from satisfactory resolution of his/her case; and the likelihood of a favorable impact on the legal rights of other individuals with disabilities.

[13] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).

[14] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).  PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [SAMHSA] agrees that private and unaccompanied access to clients and other residents should be provided and that, if denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562.  Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations.  P&A's ability to even observe the conditions that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect the rights of [facility] residents and of providing the necessary information to them.").  Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id.*

[15] 42 C.F.R. § 51.42(d).

[16] 42 C.F.R. § 51.42(c).

[17] 42 C.F.R. § 51.43.

[18] 42 C. F. R. § 51.2.

[19] 45 C.F.R. § 1386.22(f); 42 C.F.R. § 51.42(b).

[20] 42 C. F. R. § 51.2.  *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 894 F. Supp. 424, 428 (M.D. Ala. 1995) (The term "complaint" should be construed broadly to ensure full protection of the rights of persons with disabilities. Specifically, the court held that an anonymous message alleging abuse at a facility, which was left on a P&A's telephone answering machine, clearly constitutes a valid "complaint.").

---

[21] 42 C. F. R. § 51.2.  Regulatory history clarifies and courts have found that the P&A is "the final arbiter" regarding the determination of "probable cause" – that is, the determination of probable cause is within the discretion of the P&A alone. *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689, 692 (D. Ariz. 2000).  The PAIMI regulations' preamble at 62 FR 53552 provides that:

> [A] large number of commenters supported the proposal that probable cause be defined as a belief based solely on the independent judgment of the system (advocate, attorney, or other person authorized to act on behalf of the system). Commenters argued further that it be made clear that the system is not required to disclose the basis of its probable cause finding to a facility or to any other third party; their determination should not be subject to review by a facility, authority, or Court or some other third party. The Department [SAMHSA] agrees that the determination of whether sufficient probable cause exists shall be based on the independent judgment of the P&A system (that is, the judgment of the advocate, attorney, or other person authorized to act on behalf of the P&A system)[.]

The legislative history of the P&A statutes supports this conclusion. *See, e.g.*, S. Rep. No. 376, 101st Cong., 2d Sess. 23 (1990), which states that "a system may conclude there is 'probable cause' based on monitoring or other activities." (Emphasis added.)  *Mississippi Protection & Advocacy System, Inc. v. Cotten*, 929 F.2d 1054 (5th Cir. 1991);  *Maryland Disability Law Center v. Mount Washington Pediatric Hospital*, 664 A.2d 16 (Md. App. 1995); *Robbins* v. *Budke*, 739 F. Supp. 1479 (D. N.M. 1990); *Ohio Legal Rights Service v. Buckeye Ranch, Inc.,* 365 F. Supp.2d 877 (S.D.Ohio, April 12, 2005);  *Protection and Advocacy System, Inc. v. David Freudenthal*, 412 F. Supp. 2d 1211 (D.Wy., 2006).

[22] 42 C. F. R. § 51.31(g).

[23] PAIMI regulations interpretive guidance indicates that advance notice is not required for an investigation of suspected abuse or neglect.  68 F.R. 53548, 53561.  *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953 (S.D. Miss.), aff'd, 929 F.2d 1054 (5th Cir. 1991) (when a P&A has received a report relating to abuse or neglect, or has a belief that such incident may have occurred, a facility serving persons with developmental disabilities must permit the P&A "prompt access" to its premises "and to all potential witnesses of the abuse or neglect").

[24] *See Maryland Disability Law Center, Inc. v. Mount Washington Pediatric Hospital, Inc*., 106 Md. App. 55, 664 A.2d 16 (Md. Ct of Special Appeals 1995) (ruling that it would be sufficient, in those cases where the P&A has made a determination of probable cause, that the P&A provide to the facility a certification that an individual eligible for services has been subject to abuse or neglect or that incidents of abuse or neglect are resulting from a general facility policy and that such a certification need not contain any confidential information regarding specific incidents).

[25] Regulations and case law indicate that access to conduct an investigation shall be as prompt as necessary to ensure an effective investigation and that such an investigations may need to be conducted

outside of normal working hours.  The relevant interpretive guidance for section 51.42(b) of the PAIMI regulations states (at 68 F.R. 53561) states:

> "[A] access [shall] be granted at "all times necessary…" to conduct a full investigation, and particularly when the system has determined "probable cause" that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness….[I]mmediate access is necessary with respect to service providers to permit P&As to uncover situations that may involve immediate threats to health or safety.  It is also necessary to prevent service providers from concealing situations involving abuse or neglect or taking actions that may compromise evidence related to such incidents (such as intimidating staff or service recipients."

In addressing the P&A's ability to conduct an investigation at any time of the day, the *Cotten* court ruled that when a P&A has received a report relating to abuse or neglect, or has a belief that such incident may have occurred, a facility serving persons with developmental disabilities must permit the P&A "prompt access" to its premises "and to all potential witnesses of the abuse or neglect," including "nighttime hours" if necessary in order to conduct a full and complete investigation).

[26] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[27] 45 C.F.R. § 1386.22(f).

[28] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[29] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[30] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).  PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [SAMHSA] agrees that private and unaccompanied access to clients and other residents should be provided and that, if denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562. Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations.  P&A's ability to even observe the conditions that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect

the rights of [facility] residents and of providing the necessary information to them."). Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id.*

[31] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).

[32] 42 C.F.R. § 51.42(c).

[33] 42 C.F.R. § 51.43.

[34] 42 C.F.R. § 51.41 (a).

[35] 42 U.S.C. § 15043(a)(2)(j)(ii).

[36] 42 C.F.R. § 51.41 (c).